MARGARET RUTLEDGE, Employee, Plaintiff v. TULTEX CORP./KINGS YARN, Employer, and LIBERTY MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. 415PA82

(Filed 5 April 1983)

1. **Master and Servant § 68— occupational disease—last injurious exposure to hazards of disease**

Under G.S. 97-57, it is not necessary that claimant show that the conditions of her employment with defendant, her last employer, caused or significantly contributed to her occupational disease, it being necessary for her to show only that (1) she has a compensable occupational disease and (2) she was "last injuriously exposed to the hazards of such disease" in defendant's employment.

2. **Master and Servant § 93.3— workers' compensation—expert opinion testimony—omission of fact from hypothetical question**

A medical expert's opinion testimony that plaintiff's exposure to cotton dust for in excess of 25 years in her employment was probably a cause of her chronic obstructive lung disease and that impairment of her ability to perform labor is related to her pulmonary disease was admissible even though claimant's counsel made no reference in the assumed facts to claimant's having smoked cigarettes for most of her life since (1) the witness was asked to express his opinion not solely on the assumed facts but also on his own examination and testing of claimant, which examination included the taking of claimant's history which in turn revealed to the witness that claimant had a smoking habit, and (2) the omission of a material fact from a hypothetical question did not necessarily render the question objectionable or the answer incompetent.

3. **Master and Servant § 68— workers' compensation—chronic obstructive lung disease—occupational disease**

A textile worker's chronic obstructive lung disease may be an occupational disease under G.S. 97-53(13) when it is caused in part by the worker's on-the-job exposure to cotton dust and in part by exposure to other substances such as cigarette smoke, and when the disease has other components like bronchitis and emphysema which in their incipience are not work-related, provided (1) the occupation in question exposed the worker to a greater risk of contracting this disease than members of the public generally and (2) the worker's exposure to cotton dust significantly contributed to, or was a significant causal factor in, the disease's development.

4. **Master and Servant § 68— workers' compensation—cause of chronic obstructive lung disease—factors which may be considered**

In determining whether a claimant's exposure to cotton dust has significantly contributed to, or been a significant causative factor in, chronic obstructive lung disease, the Industrial Commission is not limited to a consideration of medical testimony but may consider other factual circumstances

in the case, among which are (1) the extent of the worker's exposure to cotton dust during employment, (2) the extent of other non-work-related, but contributing, exposures and components, and (3) the manner in which the disease developed with reference to the claimant's work history.

**5. Master and Servant § 68— workers' compensation—chronic obstructive lung disease—occupational disease—remand for proper determination**

A workers' compensation proceeding is remanded to the Industrial Commission for a determination as to whether plaintiff's chronic obstructive lung disease is an occupational disease for which plaintiff is entitled to benefits for total incapacity for work where the evidence would support findings that (1) plaintiff has chronic obstructive lung disease; (2) the two primary causes of this disease are the inhalation of cotton dust for 25 years while claimant was a textile worker and the inhalation of cigarette smoke over a similar period of time; (3) the disease also has components of chronic bronchitis and emphysema; (4) the disease developed gradually over the period of plaintiff's working life until by 1971 plaintiff had developed a breathing difficulty; (5) by January 1979 plaintiff's lung disease had rendered her physically unable to work in the textile industry; (6) the disease would not have developed to this extent had it not been for her exposure to cotton dust and her inhalation of cigarette smoke, both of which significantly contributed to, or were significant causative factors in, the development of the disease; (7) claimant is neither trained nor qualified to do other kinds of work and, at this time, is not able to be gainfully employed; (8) plaintiff's chronic obstructive lung disease was aggravated to some extent by her exposure to cotton dust at defendant employer's plant; and (9) plaintiff's job in the textile industry exposed her to a greater risk of contracting chronic obstructive lung disease than members of the public generally, and where there was also evidence which would support a finding that plaintiff's exposure to cotton dust played an insignificant role in the development of her pulmonary disease.

Justice MEYER dissenting.

Chief Justice BRANCH and Justice COPELAND join in this dissent.

ON plaintiff's petition for discretionary review, allowed 3 August 1982, of a Court of Appeals' decision affirming the Industrial Commission's denial of workers' compensation benefits claimed by plaintiff on the basis of an alleged occupational disease.

*Hassell, Hudson & Lore by Robin E. Hudson for plaintiff appellant.*

*Mason, Williamson, Etheridge and Moser, P.A., by James W. Mason and Terry R. Garner, for defendant appellees.*

Rutledge v. Tultex Corp.

EXUM, Justice.

The questions for decision are whether the Industrial Commission applied the wrong legal standard in its order denying benefits to claimant and whether there is evidence from which the Commission could have made findings, using the correct legal standard, that would support a conclusion that claimant contracted an occupational disease. We answer both questions affirmatively.

After hearing evidence for claimant and defendants, Deputy Commissioner Denson concluded that claimant had not contracted an occupational disease. This conclusion was based in part on the following factual findings, which are summarized unless quoted, to which no exception has been taken: Plaintiff, born 8 August 1935, has a tenth grade education and now lives in Georgia. She has smoked cigarettes from about age fifteen until February 1979 at the rate of approximately one pack per day. She has worked for four textile mills: (1) United Merchants in Buffalo, South Carolina, from 1953 until 1971 as a weaver; (2) Milliken at Union, South Carolina, from 1971 to 1973 as a "dry cleaner"; (3) Aleo Manufacturing, Rockingham, North Carolina, from 1975 to 1976 as a weaver; and (4) for defendant from 25 October 1976 until 12 January 1979 as a winder and then as a spinner. She was absent "for bronchitis" from 28 January 1977 until 13 May 1977. She "retired" on 12 January 1979.

All the plants where plaintiff worked "had a lot of cotton dust and lint" but defendant's premises, both in the weaving and spinning areas, were "relatively clean." Defendant's mill processed essentially 50 percent cotton blend materials and occasionally blends made of even a smaller percentage of cotton. "Although there was respirable cotton dust in [defendant's] weave room, there was much less than . . . in other premises." Plaintiff began developing a cough at work in 1969 or 1970. "[H]er cough was associated with her presence at work. Her shortness of breath became severe in December of 1976 and she has had various bouts with it since that time having to be out of work. . . . Plaintiff suffers from chronic obstructive pulmonary disease [with elements] of pulmonary emphysema and chronic bronchitis. . . . Plaintiff is disabled, because of her pulmonary impairment from all but sedentary . . . work which must be in a clean environment because of her reaction to cotton dust and other such irritants."

Deputy Commissioner Denson also made certain findings to which claimant excepted. The first was that in 1971 claimant "began developing a shortness of breath." Second was the following which the Deputy Commissioner included in the findings of fact:

> 6. . . . . Cigarette smoking and recurrent infection have played prominent roles in the pulmonary impairment. Cotton dust may aggravate it, but since plaintiff was showing her symptomatology in problems prior to her employment with defendant employer, *exposure at defendant employer has neither caused not significantly contributed to plaintiff's chronic obstructive pulmonary disease.*
>
> . . . .
>
> 8. Plaintiff has not contracted chronic obstructive lung disease *as a result of any exposure while working with defendant employer.* [Emphasis added.]

The Full Commission, with one commissioner dissenting, adopted Deputy Commissioner Denson's findings, conclusions, opinion and award as its own.

The Court of Appeals concluded that although the Commission erred "in requiring plaintiff to prove that her last employment was the cause of her occupational disease," the error was harmless since there was insufficient evidence before the Commission to show that plaintiff had ever contracted an occupational disease during her working life. *Rutledge v. Tultex Corp./Kings Yarn,* 56 N.C. App. 345, 350, 289 S.E. 2d 72, 74 (1982).

[1] Because of the italicized portions of findings 6 and 8, it does appear that the Commission thought that in order successfully to claim against defendant, claimant's last employer, claimant must establish that her exposure there either caused or significantly contributed to her chronic obstructive pulmonary disease. This is not the law. That part of G.S. 97-57 pertinent to this case provides:

> In any case where compensation is payable for an occupational disease, the employer in whose employment the employee was last injuriously exposed to the hazards of such disease, and the insurance carrier, if any, which was on the

risk when the employee was so last exposed under such employer, shall be liable.

Under this statute, consequently, it is not necessary that claimant show that the conditions of her employment with defendant caused or significantly contributed to her occupational disease. She need only show: (1) that she has a compensable occupational disease and (2) that she was "last injuriously exposed to the hazards of such disease" in defendant's employment. The statutory terms "last injuriously exposed" mean "an exposure which proximately augmented the disease to any extent, however slight." *Haynes v. Feldspar Producing Company*, 222 N.C. 163, 166, 169, 22 S.E. 2d 275, 277, 278 (1942).

*Haynes* was a silicosis case. The evidence showed that claimant worked in North Carolina feldspar mines for about twenty-eight years. From 1927 to 1940 he worked for Tennessee Mineral Corporation where he was constantly exposed to "silica dust." He then worked for defendant producing company from 24 September 1940 until 24 January 1941 where he was also exposed to dust from feldspar and flint. On 21 January 1941 Dr. T. F. Vestal diagnosed plaintiff as having "moderately advanced silicosis with probable infection [which] may be of a tuberculous nature." Plaintiff worked no more after 24 January 1941. Further evidence at the hearing was that samples taken at defendant's mine showed sufficient concentrations of dust "to constitute a silicosis hazard." Dr. Vestal testified that he had examined plaintiff in 1936, 1937, 1938 and 1940. By 1937 plaintiff "had early silicosis" and by 28 November 1940 plaintiff "had moderately advanced silicosis with probable infection." Dr. Vestal also testified that plaintiff was "disabled to perform normal labor as a mucker." Dr. Vestal could not state whether plaintiff's silicosis advanced any at all between the time that he entered the defendant's employment and the time that he left it. He was asked whether plaintiff was "last injuriously exposed" to the hazards of silicosis within the meaning of the predecessor to G.S. 97-57. He was told by the Commission that the phrase "last injuriously exposed" as used in the statute "meant an exposure which proximately augmented the disease to any extent, however slight." *Id.* at 166, 22 S.E. 2d at 277. The doctor then replied, to a hypothetical question, "You haven't left me much leeway. I have an opinion that it

did constitute an injurious exposure." *Id.* at 167, 22 S.E. 2d at 277. The Industrial Commission gave an award against defendant.

On defendant's appeal it contended there was no evidence to support the Commission's finding that claimant was injuriously exposed to the hazards of the disease during his short employment with defendant. This Court affirmed the Commission. The Court held that "the definition [of last injuriously exposed] supplied by the Commission was substantially correct." *Id.* at 169, 22 S.E. 2d at 278. The Court said, *id.* at 170, 22 S.E. 2d at 279:

> Perhaps on a comparative basis, the chief responsibility for plaintiff's condition morally rests upon his Tennessee employers; but not the legal liability. It must have been fully understood by those who wrote the law fixing the responsibility on the employer in whose service the last injurious exposure took place, that situations like this must inevitably arise, but the law makes no provision for a partnership in responsibility, has nothing to say as to the length of the later employment or the degree of injury which the deleterious exposure must inflict to merit compensation. It takes the breakdown practically where it occurs — with the last injurious exposure.

The Court of Appeals correctly concluded, therefore, that the Industrial Commission applied the wrong legal standards to this claim.

[2] We hold that the Court of Appeals erred, however, in concluding that there is no evidence that plaintiff had contracted an occupational disease. We think there is evidence from which the Industrial Commission could have made findings which in turn would have supported a conclusion that claimant's chronic obstructive lung disease was an occupational disease. Dr. Williams, after a lengthy recitation of certain assumed facts, was asked the following question:

> Now, based upon these facts and upon your examination and testing of Ms. Rutledge, do you have an opinion satisfactory to yourself to a reasonable medical certainty as to whether Ms. Rutledge's exposure to cotton dust for in excess of 25 years in her employment was probably a cause of her chronic obstructive lung disease which you diagnosed in your report?

When he replied, "Yes," the following colloquy occurred:

Q. What is that opinion?

A. Yes. That it probably was a cause.

Based upon the same facts and upon my examination and testing of Mrs. Rutledge, I have an opinion as to whether her impairment with respect to her ability to perform labor is related to her pulmonary disease. That opinion is that it is.

In putting the hypothetical question to Dr. Williams, claimant's counsel made no reference in the assumed facts to claimant's having smoked cigarettes regularly for most of her life. Defendant argues that because of this omission we should not consider Dr. Williams' answer to the hypothetical as competent evidence. We reject this argument. First, defendants did not object to the question, nor did they move to strike the answer. Second, the answer is competent despite the omission of claimant's smoking habit from the assumed facts. Dr. Williams was not asked to express his opinion based solely on the assumed facts; he was asked to base it also on his own examination and testing of claimant—an examination which included the taking of claimant's history which in turn revealed to Dr. Williams that she had a smoking habit. Indeed, Dr. Williams' very next statement on cross-examination was:

When I was examining Mrs. Rutledge I got a history from her. This history included her history as to smoking. She gave me the history that she began smoking at age 15 and averaged one pack of cigarettes daily until she stopped smoking in February, 1979.

Further, the omission of a material fact from a hypothetical question does not necessarily render the question objectionable or the answer incompetent. *Dean v. Carolina Coach Co.*, 287 N.C. 515, 215 S.E. 2d 89 (1975); *State v. Stewart*, 156 N.C. 636, 72 S.E. 193 (1911); 1 Brandis, Stansbury's N. C. Evidence § 137 (2d rev. ed. 1982). It is left to the cross-examiner to bring out facts supported by the evidence that have been omitted and thereby determine if their inclusion would cause the expert to modify or reject his earlier opinion. *Id.*

Indeed, defendants on cross-examination proceeded to do precisely this and succeeded in having Dr. Williams testify:

I think cigarette smoking is a very important, often the primary cause, of chronic obstructive pulmonary disease. Based upon the facts that Ms. Hudson has given me and based upon my examination and particularly upon the history of cigarette smoking that Mrs. Rutledge gave me it is my opinion satisfactory to myself to a reasonable degree of medical certainty is that her history of cigarette smoking could or might have been the cause of her pulmonary emphysema and chronic bronchitis. Based upon my examination and these facts, I would say it was one of the more probable causes. This is after taking into consideration her exposure to cotton dust.

The thrust of Dr. Williams' entire testimony, then, seems to be that both her exposure to cotton dust over her working life and her cigarette smoking were causative factors in claimant's chronic obstructive lung disease. He also said other components of the lung disease were "pulmonary emphysema" and "chronic bronchitis" and that "chronic obstructive lung disease includes pulmonary emphysema, chronic bronchitis, and possibly asthma."

After relating his considerable experience in the treatment and study of respiratory diseases among textile workers, such as claimant here, Dr. Williams testified that these workers are "at an increased risk of contracting chronic obstructive pulmonary disease." Dr. Williams also testified that when claimant began such work in October 1976 "she was suffering from pulmonary emphysema, chronic bronchitis and chronic obstructive pulmonary disease . . . caused by circumstances which existed prior to her employment by Kings Yarn." Although testifying that claimant's exposure to cotton dust at Kings Yarn's plant would have "minimal" effect on her condition and that she would not have had there a "very substantial exposure" to cotton dust, Dr. Williams did say that such exposure as she had at Kings Yarn "could have some aggravating effect on [her] underlying condition" and that removal from the Kings Yarn "environment would probably improve her symptoms . . . primarily, her symptoms of cough." Dr. Williams testified flatly that claimant's exposure to respirable cotton and synthetic dust at Kings Yarn "would have aggravated her condition." Medical records offered in evidence tended to show that claimant's lung function had

decreased some 25 to 30 percent during the period from January 1977 to March 1979, while she worked for defendant employer.

Claimant, herself, described in some detail the dusty conditions under which she had worked for twenty-five years in various textile mills. She said she developed a breathing difficulty in 1971 which by 1977 had begun "affecting my ability to do my job" because it caused her to be too fatigued to work. She said she stopped work in January 1979 "because I was unable to perform my duties on my job. From tiredness, short of breath, cold sweats, headaches and I felt I was not being fair to myself or the company. I did not just quit, I was advised by my doctor . . . to quit." Claimant testified that when she quit work "my symptoms were difficulty breathing, wheezing, tiredness, cold sweats, [and] stiffness in my neck. I coughed so hard until the [neck] muscle, you know, it's ruptured in the left side." By January 1979 claimant said that she did not have the "strength or ability to do my housework, my shopping or any of those things. I am able to do my daily routine, I can make a bed, at which time I have to rest. . . . I help [my mother] watch dinner and the rest of my day consists of soap operas and rest. I crochet, anything to pass time. I just cannot be exerted because if I do I just don't have the breath. I do drive. I don't have any training for jobs besides working in the mill."

For a disease to be occupational under G.S. 97-53(13) it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [claimant's] employment." *Hansel v. Sherman Textiles*, 304 N.C. 44, 52, 283 S.E. 2d 101, 105-06 (1981); *Booker v. Duke Medical Center*, 297 N.C. 458, 468, 475, 256 S.E. 2d 189, 196, 200 (1979). To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. *Booker v. Duke Medical Center, supra*, 297 N.C. at 472-75, 256 S.E. 2d at 198-200. Thus, the first two elements are satisfied if, as

a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally. *Id.* "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation." *Id.* at 475, 256 S.E. 2d at 200.

This Court has had little difficulty either articulating or applying the first two standards in occupational disease cases generally. They were articulated and properly applied in *Booker,* a hepatitis case, and reiterated and properly applied in *Hansel,* a lung disease case. We have had some difficulty in the lung disease cases, however, in both articulating and applying a factual standard for determining whether there is an appropriate causal connection between the employment and the disease. *Compare* the majority and dissenting opinions in *Morrison v. Burlington Industries,* 304 N.C. 1, 282 S.E. 2d 458 (1981), *and Hansel v. Sherman Textiles, supra,* 304 N.C. 44, 283 S.E. 2d 101. *See also Walston v. Burlington Industries,* 304 N.C. 670, 285 S.E. 2d 822, *amended on rehearing,* 305 N.C. 296, 285 S.E. 2d 822 (1982).

This difficulty in the lung disease cases stems largely from the complex medical picture often presented by chronic obstructive lung disease and chronicled in the medical testimony in *Walston, Hansel* and *Morrison.* This disease, as we understand it from the medical testimony presented in these cases and the literature to which we have been referred, *see, e.g.,* Bouhuys, Schoenberg, Beck and Schilling, *Epidemiology of Chronic Lung Disease in a Cotton Mill Community,* Service Volume Five of Traumatic Medicine and Surgery for the Attorney 607, reprinted from *Lung—An International Journal on Lungs, Airways, and Breathing,* 154(3): 167-86 (1977), has several components. Some of these components are seemingly not, in their incipience at least, work related, for example, bronchitis, emphysema and asthma; while at least one component, *i.e.,* byssinosis, is work related. Byssinosis may be understood as the adverse effect on the lungs resulting from the inhalation of cotton dust, a substance generally present in the work environment of textile mill employees. Other complicating factors are that chronic obstructive lung disease may apparently be brought on by just the continuous inhalation of cotton dust, just the continuous inhalation of other substances, such as cigarette smoke, or by the inhalation of both kinds of substances together. It is apparently medically impossible even

on autopsy objectively to distinguish the effect on the lungs of cigarette smoke inhalation and the inhalation of cotton dust, or between the effects of bronchitis and the inhalation of these substances. Thus when a textile worker who is also an habitual cigarette smoker and who suffers from bronchitis, emphysema, or asthma, contracts disabling chronic obstructive lung disease, the medical experts and, in turn, the Commission and the courts are presented with a difficult factual question on the causation issue. Since courts generally develop principles of law to deal as justly as possible with the facts of given cases, complex facts which the experts themselves have difficulty unraveling make the articulation of appropriate legal principles correspondingly difficult for the courts.

In *Morrison* claimant was physically disabled for all but sedentary work, but the Commission, after concluding that only 55 percent of her disability was caused by her occupational disease, which the Commission saw as only byssinosis, entered an award for 55 percent partial incapacity for work. A majority of this Court affirmed; it, like the Commission, viewed Morrison's occupational disease as byssinosis, *i.e.*, that part of her chronic obstructive lung disease caused by her exposure to cotton dust. The Commission found:

> 7. Plaintiff suffers from chronic obstructive lung disease, due, in part, to causes and conditions characteristic of and peculiar to her particular trade, occupation or employment in the textile industry. *That part of her lung disease which is related to her employment is not an ordinary disease of life to which the general public is equally exposed outside of such employment.*

> 8. Due to the chronic obstructive lung disease suffered by plaintiff, and due to her other physical infirmities, including bronchitis, phlebitis, varicose veins and diabetes, plaintiff has no earning capacity in any employment for which she can qualify in the labor market.

> 9. *The claimant is only partially incapacitated for work as a result of conditions which were caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries. Although the plaintiff is totally incapacitated for work, only fifty-five percent of*

Rutledge v. Tultex Corp.

*her incapacity was caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries.* The remaining forty-five percent of the plaintiff's incapacity for work was not caused by an occupational disease, and was not caused, aggravated, or accelerated by an occupational disease or by exposure to cotton dust during the course of her employment at Burlington Industries.

. . . .

11. *As a result of the chronic obstructive pulmonary disease caused by her exposure to cotton dust, plaintiff has only a partial incapacity for work. She has sustained a fifty-five percent loss of wage-earning capacity or ability to earn wages by reason of her cotton dust exposure.*

304 N.C. at 4-5, 282 S.E. 2d at 462-63 (emphasis added). Thus the Commission found that only that part of Mrs. Morrison's chronic obstructive lung disease caused by her exposure to cotton dust, *i.e.,* her byssinosis, was an occupational disease, and that this disease caused her to suffer a fifty-five percent partial incapacity for work. It made an award for fifty-five percent partial disability, the *full amount* of claimant's disability which it found to have been caused by claimant's occupational disease. A majority of this Court concluded that the Commission's findings were supported by the evidence and the Court was bound by them. The majority posed the question for decision and its answer as being:

When the Industrial Commission finds as fact, supported by competent evidence, that a claimant is totally incapacitated for work and 55 percent of that incapacity is caused, accelerated or aggravated by an occupational disease and the remaining 45 percent of that incapacity for work was not caused, accelerated or aggravated by an occupational disease, must the Commission, under the Workers' Compensation Act of North Carolina, award compensation for 55 percent disability or 100 percent disability? Upon such findings of fact, our Act mandates an award for 55 percent partial disability.

304 N.C. at 6, 282 S.E. 2d at 463. This Court's majority thought the evidence specifically supported the Commission's findings

that only that part of Mrs. Morrison's chronic obstructive lung disease caused by her exposure to cotton dust, *i.e.*, her byssinosis, was an occupational disease and that it was bound by this finding. It said:

> The evidence in this case, especially the medical evidence, overwhelmingly supports the Industrial Commission's findings that 55 percent of Mrs. Morrison's inability to work and earn wages is caused by 'chronic obstructive lung disease, due in part, to causes and conditions characteristic of and peculiar to her particular . . . employment in the textile industry,' and the remaining 45 percent is caused independently by her other physical infirmities, including chronic obstructive lung disease not caused, aggravated or accelerated by an occupational disease, as well as bronchitis, phlebitis, varicose veins and diabetes, none of which are job related and none of which have been aggravated or accelerated by her occupational disease. This Court must accept such findings as final factual truth.

304 N.C. at 6-7, 282 S.E. 2d at 463.

The dissenters in *Morrison* believed that both the Commission and the majority had misconstrued the evidence. The dissenters argued that the Commission's finding that only that part of Mrs. Morrison's lung disease caused by her exposure to cotton dust, *i.e.*, byssinosis, was an occupational disease was not supported by the evidence. The dissenters argued that *all* the evidence tended to show: (1) Mrs. Morrison's entire physical disability was caused by her chronic obstructive lung disease; (2) her byssinosis had significantly contributed to this disease; (3) her chronic obstructive lung disease was an occupational disease; (4) therefore Mrs. Morrison was entitled to an award for total disability.

Thus, the difference between the majority and the dissenters in *Morrison* rested largely on how the evidence in that case should have been interpreted and whether the Commission's findings were supported by the evidence.

In *Hansel* the Commission in a lung disease case again made an award for permanent *partial* incapacity for work which the Court of Appeals vacated for insufficient evidence. There was

medical testimony that claimant had chronic obstructive lung disease with "three distinct syndromes" contributing to it. These "syndromes" were identified by the medical witness as asthma, byssinosis and chronic bronchitis. There was also evidence that claimant was a cigarette smoker. 304 N.C. at 55-56, 283 S.E. 2d at 109.

The Commission found and concluded:

4. Plaintiff has both asthma and byssinosis which are causing her respiratory impairment. Her impairment is severe and irreversible.

5. Plaintiff *has byssinosis* as a result of her exposure to cotton dust in her employment with defendant-employer and this is partly responsible for her disability.

6. Plaintiff has not worked since May 5, 1977.

\* \* \*

The foregoing findings of fact and conclusions of law engender the following additional

CONCLUSIONS OF LAW

1. *Plaintiff has contracted the disease byssinosis* as a result of exposure to cotton dust in her employment with defendant-employer. *This disease* is compensable under the provisions of G.S. 97-53(13).

2. *Defendants owe plaintiff compensation for permanent, partial disability* from May 5, 1977 for her period of disability not to exceed 300 weeks. G.S. 97-30.

*Id.* at 47-48, 283 S.E. 2d at 103 (emphasis added). This Court concluded, contrary to the Court of Appeals' decision, that the evidence *was* sufficient to support the findings of the Commission, stating: "We . . . find competent evidence to support the findings of the Commission, but we are unable to say that the findings justify the Commission's conclusion as to the causation and its award." 304 N.C. at 50, 283 S.E. 2d at 105. The Court on this ground and also on the ground that the medical evidence was "not sufficiently definite on the cause of plaintiff's disability to permit effective appellate review," 304 N.C. at 55, 283 S.E. 2d at 107, remanded the matter to the Commission for further proceedings. The Court said:

In the case before us in which the Commission made an award of compensation, there was not sufficient determination by the finders of fact, and certainly no explicit findings, upon which this Court can determine the sufficiency of the evidence to support the Commission's findings and conclusion. It is explicitly stated in the Commission's finding number 5 that plaintiff's byssinosis 'is partly responsible for her disability' and thus implicit that some other disease or infirmity is likewise 'partly responsible for her disability.' The evidence indicates that the other disease or infirmity is probably asthma and chronic bronchitis, although plaintiff also testified that two other doctors told her previously that she had emphysema. It also appears from the evidence that she is apparently also allergic to, among other things, dust, mold, mildew, trees, grass, animals, feathers, cotton dust, nylon dust and polyester dust. Because of the presence of these other infirmities and because this is a case of partial disability as opposed to one of total disability, it must be determined what percentage of claimant's disability is due to her occupational disease. *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458 (1981).

The medical evidence appearing in the record before this Court is not sufficiently definite on the cause of plaintiff's disability to permit effective appellate review. The only medical witness before the Commission, Dr. Harris, did not address the crucial medical question of interrelationship, if any, between plaintiff's occupational disease and her disability.

304 N.C. at 54-55, 283 S.E. 2d at 107. The Court directed that at the new hearing before the Commission medical testimony be adduced to shed light on various questions dealing generally with the extent of claimant's disability; the nature of the disease or diseases causing the disability; and whether these diseases were occupational or were aggravated in such a way as to cause them to be compensable.

Again, as in *Morrison*, the Commission had found that claimant's byssinosis was the occupational disease which had caused claimant to be partially disabled for work. Again, a majority of the Court seemed to believe that if claimant had an occupational

disease at all, it was byssinosis. The majority noted that claimant sought recovery "on the grounds that she contracted byssinosis as a result of exposure to cotton dust in the course of her employment as a textile worker in defendant's plant." *Id.* at 46, 283 S.E. 2d at 102. The Court noted further that "[b]yssinosis is 'not mentioned in and compensable under' the [Workers' Compensation] Act, except by virtue of G.S. 97-53[13]." *Id.* at 51, 283 S.E. 2d at 105. The Court pointed out that "neither Mrs. Hansel's asthma nor her chronic bronchitis is an 'occupational disease' which *standing alone* is compensable." *Id.* at 53, 283 S.E. 2d at 106 (emphasis added).

The concurring justices in *Hansel* doubted that medical evidence could provide the answers to several of the questions posed by the majority on the ground that these questions really constituted legal conclusions which the Commission in the first instance and this Court ultimately would have to make. Again, as in *Morrison*, the concurring justices believed, despite the finding of the Commission to the contrary, the evidence demonstrated that if Mrs. Hansel had an occupational disease at all, it was chronic obstructive lung disease to which Mrs. Hansel's cotton dust exposure might have significantly contributed. Again, the concurring justices believed the Commission and the majority had misconstrued the evidence.

Thus the results in both *Morrison* and *Hansel* rest on the proposition that when byssinosis is or may be the occupational disease in question and causes a worker to be partially physically disabled, and other infirmities, acting independently of and not aggravated by the byssinosis, also cause the worker to be partially disabled, the worker is entitled to compensation for so much of the incapacity for work as is due to the physical disability caused by the byssinosis.

[3] This case is the first we have considered in which the Commission *has found on supporting evidence* both that claimant is totally physically disabled except for sedentary work and that this physical disability is due entirely to *chronic obstructive lung disease.* What we have to decide is whether there is evidence in the record from which the Commission could have made findings to support a conclusion that this disease, chronic obstructive lung disease, is an occupational disease. The question now clearly

before us for the first time is whether a textile worker's *chronic obstructive lung disease* may be an occupational disease under G.S. 97-53(13) when it is caused in part by the worker's on-the-job exposure to cotton dust and in part by exposure to other substances, such as cigarette smoke, and when the disease has other components like bronchitis and emphysema which in their incipience at least are not work-related. Neither *Hansel* nor *Morrison* provide an answer to this question.

It is clear in this case, as it was *not* clear in *Hansel* and *Morrison*, that if plaintiff has an occupational disease at all it is chronic obstructive lung disease. The Commission has found that "plaintiff suffers from chronic obstructive pulmonary disease [with elements] of pulmonary emphysema and chronic bronchitis. . . . Plaintiff is disabled, because of her pulmonary impairment from all but sedentary . . . work . . . ." Dr. Williams diagnosed the condition which he thought physically disabled plaintiff as chronic obstructive lung disease. Dr. Williams testified that claimant's exposure to cotton dust "probably was a cause" of her chronic obstructive lung disease which in turn was the cause of her disability. He also testified as follows:

> The patient has definite chronic obstructive pulmonary disease representing a combination of pulmonary emphysema and chronic bronchitis. It is most likely that cigarette smoking and recurrent infection has played prominent roles in her pulmonary impairment. It is not possible to completely exclude cotton dust as playing some role in causing an irritative bronchitis but she does not give a classical history of byssinosis.

Our answer to the question posed is that chronic obstructive lung disease may be an occupational disease provided the occupation in question exposed the worker to a greater risk of contracting this disease than members of the public generally, and provided the worker's exposure to cotton dust significantly contributed to, or was a significant causal factor in, the disease's development. This is so even if other non-work-related factors also make significant contributions, or were significant causal factors.

*Significant* means "having or likely to have influence or effect: deserving to be considered: important, weighty, notable."

Webster's Third New International Dictionary (1971). *Significant* is to be contrasted with *negligible, unimportant, present but not worthy of note, miniscule,* or *of little moment.* The factual inquiry, in other words, should be whether the occupational exposure was such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work.

This Court in *Vause v. Vause Farm Equipment Co.,* 233 N.C. 88, 63 S.E. 2d 173 (1951), recognized that the hazards of employment do not have to be the sole cause of a worker's injury in order for the worker to receive compensation for the full extent of his incapacity for work caused by the injury. Although concluding that there was no causal relationship between the worker's employment and his injury, the Court in *Vause* said, *id.* at 92-93, 63 S.E. 2d at 176:

> The hazards of employment do not have to set in motion *the sole causative* force of an injury in order to make it compensable. By the weight of authority it is held that where a workman by reason of constitutional infirmities is predisposed to sustain injuries while engaged in labor, nevertheless the leniency and humanity of the law permit him to recover compensation *if the physical aspects of the employment contribute in some reasonable degree to bring about or intensify the condition which renders him susceptible to such accident and consequent injury.* But in such case 'the employment must have some definite, discernible relation to the accident.' [Citation omitted.]

> Similarly, it is generally held that where an employee is seized with an epileptic fit . . . and falls due to such . . . causes, even so compensation will be awarded if a particular hazard inherent in the working conditions also contributes to the fall and consequent injury. [Citation omitted.]

> . . . .

> It appears . . . that the better considered decisions adhere to the rule that *where the accident and resultant injury arise out of both the idiopathic condition of the workman and hazards incident to the employment, the employer is liable.*

But not so where the idiopathic condition is the sole cause of the injury. [Emphasis supplied.]

In *Hansel*, this Court recognized that *Vause* stands for the proposition that "the rule of causation is that where the right to recover is based on injury by accident, the employment need not be the sole causative force to render an injury compensable." 304 N.C. at 52, 283 S.E. 2d at 106. The Court also noted in *Hansel* that "[i]t has on occasion been implied that a similar rule of causation should prevail in cases where compensation for occupational disease is sought; however, if a disease is produced by some extrinsic or independent agency, it may not be imputed to the occupation or the employment. *Duncan v. Charlotte*, 234 N.C. 86, 66 S.E. 2d 22 (1951); *Moore v. Stevens & Co.*, 47 N.C. App. 744, 748, 269 S.E. 2d 159, 162 (1980)." 304 N.C. at 53, 283 S.E. 2d at 106. In both *Duncan* and *Moore*, as in *Vause*, there was *no* causal relation between the disease and the employment.

In *Smith v. Fieldcrest Mills, Inc.*, 224 Va. 24, 294 S.E. 2d 805 (1982), claimant Smith, employed as a textile worker for more than thirty-four years and exposed to "large quantities" of cotton dust, was diagnosed as having "severe chronic obstructive pulmonary disease." Medical testimony was that the disease's components were emphysema, chronic bronchitis, and that "chronic byssinosis is a significant component of [Mrs. Smith's] pulmonary problem." Medical testimony showed that byssinosis was "more likely than not [an] etiologic factor in the evolution of chronic bronchitis" and "cigarette smoking may be a relative causative factor." *Id.* at ---, 294 S.E. 2d at 806-07. The Virginia Industrial Commission denied an award on the ground that "it is just as probable that [Mrs. Smith's condition] resulted from a noncompensable cause (smoking) as that it resulted from a compensable cause (cotton dust exposure)." *Id.* at ---, 294 S.E. 2d at 807. The Virginia Supreme Court, in an opinion by Chief Justice Carrico, reversed the Commission and remanded the matter for further proceedings. The Court relied on its earlier case of *Bergmann v. L. & W. Drywall*, 222 Va. 30, 278 S.E. 2d 801 (1981), in which the worker had suffered a back injury at work. Following this injury the worker was stricken with a non-occupational neurological disorder which, together with the back injury, rendered him incapable of working. The Industrial Commission denied any benefits on the ground that the neurological disorder

was just as probable a cause of the incapacity for work as the work-related back injury. The Virginia Supreme Court reversed this ruling, stating that it was not necessary that the work-related injury be the sole cause of the worker's incapacity for work but that full benefits would be allowed when it is shown that "the employment is a contributing factor to the disability." *Id.* at 32, 278 S.E. 2d at 803. In *Smith,* the lung disease case, the Court said that the same rule should apply. It remanded the matter to the Commission in order for it to determine whether Mrs. Smith's exposure to cotton dust, *i.e.,* her byssinosis, was "a contributing factor" to Mrs. Smith's ultimate disability. 224 Va. at ---, 294 S.E. 2d at 808.

Cases from jurisdictions other than Virginia with statutes like ours support our holding here. *Newport News Shipbuilding & Dry Dock Co. v. Director,* 583 F. 2d 1273 (4th Cir. 1978), *cert. denied,* 440 U.S. 915 (1979); *Pullman Kellogg v. Workmen's Compensation Appeals Bd.,* 26 Cal. 3d 450, 605 P. 2d 422, 161 Cal. Rptr. 783 (1980); *McAllister v. Workmen's Compensation Appeals Bd.,* 69 Cal. 2d 408, 445 P. 2d 313, 71 Cal. Rptr. 697 (1968); *Thornton Chevrolet, Inc. v. Morgan,* 148 Ga. App. 711, 252 S.E. 2d 178 (1979); *Riley v. Avondale Shipyards,* 305 So. 2d 742 (La. App. 1975); *Langlais v. Superior Plating, Inc.,* 226 N.W. 2d 891 (Minn. 1975); *Bolger v. Chris Anderson Roofing Co.,* 112 N.J. Super. 383, 271 A. 2d 451 (1970), *aff'd* 117 N.J. Super. 497, 285 A. 2d 228 (1971); *Mueller v. State Accident Ins. Fund,* 33 Or. App. 31, 575 P. 2d 673 (1978). *See generally* 1B Larson, Workmen's Compensation Law, § 41.64(a)-(c) (1982).

In these cases cigarette smoking together with the inhalation of occupational substances produced either lung disease, *see Newport News Shipbuilding, Pullman Kellogg, Thornton Chevrolet, Riley, Langlais* and *Mueller,* or lung cancer, *see McAllister* and *Bolger.* The courts concluded in all cases, however, that because there was evidence that inhalation of occupational substances contributed to the diseases, the diseases were compensable occupational diseases. The courts, therefore, either affirmed compensation awards, as they did in *Newport News Shipbuilding, Pullman Kellogg, Thornton Chevrolet, Riley, Langlais* and *Bolger,* or reversed denials of awards by administrative agencies, as they did in *McAllister* and *Mueller.*

Indeed, the significant contribution principle which we adopt puts upon the claimant in these lung disease cases a somewhat

heavier burden than our sister states seem to require or that we require in industrial accident cases. Our purpose in adopting this principle is to strike a fair balance between the worker and the employer in the administration of our Workers' Compensation Act as it is applied to the difficult lung disease cases. To hold that the inhalation of cotton dust must be the sole cause of chronic obstructive lung disease before this disease can be considered occupational establishes too harsh a principle from the standpoint of the worker and the purposes and policies of our Workers' Compensation Act. This Act "should be liberally construed so that the benefits under the Act will not be denied by narrow, technical or strict interpretation." *Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972). On the other hand, to hold the causation requirement is satisfied if cotton dust exposure contributes to the slightest extent, however miniscule or insignificant, to the etiology of chronic obstructive lung disease, places too heavy a burden on industry. This holding would compromise the valid principle that our Workers' Compensation Act should not be transformed into a general accident and heath insurance law.

[4]   In determining whether a claimant's exposure to cotton dust has significantly contributed to, or been a significant causative factor in, chronic obstructive lung disease, the Commission may, of course, consider medical testimony, but its consideration is not limited to such testimony. It may consider other factual circumstances in the case, among which are (1) the extent of the worker's exposure to cotton dust during employment; (2) the extent of other non-work-related, but contributing, exposures and components; and (3) the manner in which the disease developed with reference to the claimant's work history. *See Booker v. Duke Medical Center, supra,* 297 N.C. at 476, 256 S.E. 2d at 200.

[5]   In the case before us it is clear that claimant suffers from chronic obstructive lung disease, which prevents her from doing anything but sedentary work. The Commission has so found. There is also evidence that claimant's exposure to cotton dust in her employment "probably was a cause" of her lung disease, that cigarette smoking "was one of the more probable causes . . . after taking into consideration her exposure to cotton dust," and that "emphysema" and "chronic bronchitis" were components of the disease. Further evidence, largely from the claimant herself,

detailed her twenty-five years of exposure to cotton dust and the gradual development during those years of her breathing difficulty to the point where it simply rendered her so physically disabled that she could no longer work at the only trade she knew and for which she was qualified. There was also evidence that textile workers, such as claimant here, are "at an increased risk of contracting chronic obstructive pulmonary disease" and that her exposure to cotton dust at Kings Yarn would have aggravated claimant's pulmonary condition existing at the time she went to work there. There was also some evidence that claimant's exposure to cotton dust played an insignificant role in the development of claimant's lung disease. Dr. Williams, as already noted, said: "It is not possible to completely exclude cotton dust as playing some role in causing an irritative bronchitis but she does not give a classical history of byssinosis."

From this evidence the Commission could have found as facts, although it would not have been compelled to find, that: (1) claimant has chronic obstructive lung disease; (2) the two primary causes of this disease are the inhalation of cotton dust for twenty-five years while claimant was a textile worker and the inhalation of cigarette smoke over a similar period of time; (3) the disease also has components of chronic bronchitis and emphysema; (4) the disease developed gradually over the period of claimant's working life until by 1971 claimant had developed a breathing difficulty; (5) by 1977 her breathing difficulty began to affect her ability to do her job because it caused her to be too fatigued to work; (6) by January 1979 claimant's lung disease had rendered her physically unable to work in the textile industry; (7) the disease would not have developed to this extent had it not been for her exposure to cotton dust and her inhalation of cigarette smoke, both of which significantly contributed to, or were significant causative factors in, the development of the disease; (8) because of her age, limited education, and her lifetime of employment in the textile industry, claimant is neither trained nor qualified to do other kinds of work and, at this time, is not able to be gainfully employed; (9) claimant's chronic obstructive lung disease was aggravated to some extent by her exposure to cotton dust at Kings Yarn; and (10) claimant's job in the textile industry exposed her to a greater risk of contracting chronic obstructive lung disease than members of the public generally.

These findings of fact, if made by the Commission, would support the following legal conclusions: (1) claimant's chronic obstructive lung disease is due to causes and conditions characteristic of and peculiar to the textile industry under G.S. 97-53(13); (2) claimant's chronic obstructive lung disease is not an ordinary disease of life to which the general public not employed in the textile industry is equally exposed under G.S. 97-53(13); (3) claimant's chronic obstructive lung disease is, therefore, an occupational disease under G.S. 97-53(13); (4) claimant is totally incapacitated for work under G.S. 97-29, 97-54, and 97-2(9); (5) claimant's total incapacity for work results from her occupational disease under G.S. 97-52; and (6) claimant's last injurious exposure to the hazards of her occupational disease were in the employment of defendant Kings Yarn under G.S. 97-57. These conclusions of law would, in turn, support an award against defendants and in favor of claimant for workers' compensation benefits for total incapacity for work by reason of an occupational disease.

On the other hand there is some testimony from Dr. Williams which would have supported a finding that claimant's exposure to cotton dust played an insignificant causal role in, or did not significantly contribute to, the development of Ms. Rutledge's lung disease. If the Commission so finds, it would have to conclude that the disease is not an occupational disease in this case.

The Court of Appeals relied on *Walston v. Burlington Industries, supra,* 304 N.C. 670, 285 S.E. 2d 822, *amended on rehearing,* 305 N.C. 296, 285 S.E. 2d 822, for its conclusion that the evidence was insufficient to show claimant had an occupational disease. In *Walston* the principal medical witness could testify only that claimant's exposure to cotton dust "could *possibly* have played a role in the causation of his pulmonary problems." *Id.* at 672, 285 S.E. 2d at 827 (emphasis supplied). This Court held, 304 N.C. at 679, 285 S.E. 2d at 828:

> While smoking 'was almost certain[ly] the primary etiologic agent,' there was only a 'possibility' that any portion of plaintiff's disability was caused by the inhalation of cotton dust. Such evidence supports the findings and conclusions of the Commission that plaintiff failed to meet his burden of proof, *i.e.,* failed to prove that he had an occupational disease defined in G.S. 97-53(13). A mere possibility of causation is neither 'substantial' nor sufficient.

In the case at bar the medical witness testified claimant's exposure to cotton dust *"probably was* a cause" (emphasis supplied) of her chronic obstructive lung disease. Therein lies the difference in this case and *Walston. See Moore v. Stevens & Co.,* 47 N.C. App. 744, 752, 269 S.E. 2d 159, 164, *disc. review denied,* 301 N.C. 401, 274 S.E. 2d 226 (1980) (physician's opinion that "referred to 'possibility' rather than 'probability'" justified Commission's finding that "plaintiff's chronic pulmonary disease 'is not due to her exposure to cotton dust and lint in her employment'"); *see also, Lockwood v. McCaskill,* 262 N.C. 663, 668-69, 138 S.E. 2d 541, 545-46 (1964) ("The 'could' or 'might' as used by Stansbury [in discussing hypothetical questions propounded to expert witnesses] refers to probability and not mere possibility. . . . If it is not reasonable probable . . . that a particular effect is capable of production by a given cause . . . the evidence is not sufficient to establish *prima facie* the causal relation . . . ."; the Court stated that testimony showing a particular causal relation is a mere possibility or conjecture should have been excluded).

We conclude that the Court of Appeals correctly determined that the Industrial Commission decided this case under a misapprehension of applicable law and that the Court of Appeals erred in determining that there was no evidence from which the Commission could make findings sufficient to support a conclusion that claimant suffered from an occupational disease. The decision of the Industrial Commission, therefore, is vacated and the case is remanded to the Commission for a new determination of claimant's entitlement to benefits under the legal principles herein set out.

The dissent argues that there is evidence that claimant had other physical ailments unrelated to her pulmonary disease which might have contributed independently of this disease to her incapacity for work. It is true that there was some evidence of these other ailments. The Commission, however, has found that plaintiff's incapacity for work is due entirely to her pulmonary disease. This finding is supported by the evidence and forecloses the argument in the dissent that these other ailments might have contributed to the claimant's incapacity for work. By our remand of the case, therefore, we do not intend to suggest to the Commission that it re-open this aspect of the case. The only question for reconsideration by the Commission is whether the pulmonary

disease is an occupational disease when the legal principles set out in this opinion are applied to the facts.

Affirmed in part; reversed in part and remanded.

Justice MEYER dissenting.

I respectfully dissent. The majority today, although without expressly so stating, has subtly but effectively reversed the position of this Court, adopted so recently in *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458 (1981), *Hansel v. Sherman Textiles*, 304 N.C. 44, 283 S.E. 2d 101 (1981), and *Walston v. Burlington Industries*, 304 N.C. 670, 285 S.E. 2d 822 (1982). In these three cases the Court was confronted, as it is in the present case, with difficult and complex issues relating to causation, apportionment, and disability. I believe that a careful reading of the majority opinions in *Morrison, Hansel* and *Walston* will reveal a correct, logical and consistent approach to these issues and that adherence to the principles enunciated in these cases leads to the inescapable conclusion that this claimant has failed to prove that she is entitled to compensation.

The majority would have us believe that the "difference between the majority and the dissenters in *Morrison* rested largely on how the evidence in that case should have been interpreted and whether the Commission's findings were supported by the evidence." In fact, the difference was far more significant and fundamental. It is that difference, as expressed in the *Morrison* dissent, which today forms the basis for the majority's opinion.

In *Morrison* the dissenters first found as a "fundamental legal" error the majority's position that "unless an occupational disease medically aggravates or accelerates some pre-existing condition, it must be the *sole* cause of a worker's incapacity for work in order for the worker to be compensated for the full extent of the incapacity." *Id.* at 23, 282 S.E. 2d at 473. In this respect, the dissenters wrote:

> Neither must the worker in such cases, contrary to the majority's assertion, show that the occupational disease is medically related to his pre-existing infirmities or that these infirmities have somehow been medically aggravated by the disease. The question is not how the occupational disease and

the other infirmities are medically connected. The question is how they are connected vis-a-vis the worker's capacity to work. This is the true meaning of the aggravation principle, recognized but wrongly restricted by the majority to aggravation in a medical sense.

*Id.* at 24-25, 282 S.E. 2d at 473-74.

The dissenters further commented that:

Neither is it necessary that the industrial accident or occupational disease be medically related to, or medically aggravate, the worker's pre-existing infirmities. It is enough if the industrial accident or occupational disease physically combines or interacts with the worker's pre-existing infirmities to produce incapacity for work so long as these pre-existing infirmities are themselves insufficient to cause any incapacity for work. In such cases the award may not be made as if the worker were incapacitated only to the extent of the industrial accident's or occupational disease's contribution.

*Id.* at 37, 282 S.E. 2d at 481.

The second fundamental legal error committed by the majority, as alleged by the *Morrison* dissenters, was its position "that occupational conditions must be the sole cause of an occupational disease in order for a worker to be compensated for the full extent of the incapacity for work caused by the disease." *Id.* at 23, 282 S.E. 2d at 473.

Speaking to this question, the dissenters would have adopted the "significant contribution" test as follows:

The notion of 'reasonable' or 'substantial' contribution referred to in these cases is better expressed by the term 'significant.' The occupational conditions, in other words, must have significantly contributed to the disease's development in order for the disease to be occupational. Significant means 'having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE.' Webster's Third New International Dictionary (Merriam-Webster 1971). Significant is to be contrasted with negligible, unimportant, present but not worthy of note, miniscule, of little moment. The factual inquiry, in other words, should be

whether the occupational exposure was such a significant factor in the disease's development that without it the disease would either (1) not have developed or (2) not have developed to such an extent as to result in the employee's incapacity for work for which he claims benefits.

*Id.* at 43, 282 S.E. 2d at 484.

The issue in the present case, as framed by the majority, is "whether a textile worker's *chronic obstructive lung disease* may be an occupational disease under G.S. 97-53(13) when it is caused in part by the worker's on-the-job exposure to cotton dust and in part by exposure to other substances, such as cigarette smoke, and when the disease has other components like bronchitis and emphysema which in their incipience at least are not work related." It seems clear to me that the majority today has adopted the dissenting opinion in *Morrison* in its holding that "chronic obstructive lung disease may be an occupational disease provided the occupation in question exposed the worker to a greater risk of contracting this disease than members of the public generally, and provided the worker's exposure to cotton dust *significantly contributed* to, or was a significant causal factor in, the disease's development. *This is so even if other non-work-related factors also make significant contributions, or were significant causal factors.*" (Emphasis added.)

In adopting the dissenters' position in *Morrison,* the majority in the case *sub judice* must now understandably find that the "Industrial Commission decided this case under a misapprehension of applicable law . . . ." The majority attempts to distinguish this case from *Morrison, Hansel* and *Walston* in that Mrs. Rutledge suffers from chronic obstructive lung disease rather than byssinosis. The majority attempts to distinguish this case on the basis of slight factual variations. These attempted distinctions, in my opinion, do not disguise the fact that the "applicable law" has undergone a drastic and significant change. In effect, the majority has redefined "occupational disease" to include all ordinary diseases of life to which conditions of the workplace have significantly contributed, irrespective of non-work-related causal factors. The proposition has no statutory basis. We should leave the adoption of new laws to the Legislature, especially when the new law replaces old law which is exclusively statutory in origin.

To fully appreciate just how significantly the majority opinion departs from our existing law, it is necessary to review at least the highlights of the testimony of the only expert medical witness who testified, Dr. Charles D. Williams, Jr., a specialist in pulmonary disease and a member of the Industrial Commission's Occupational Disease Panel. The following represents a fair summary of his testimony:

I had occasion to examine and evaluate Margaret Rutledge in this particular case. That was in August of 1979. At that time I took a history from Mrs. Rutledge and I did pulmonary function testing and we did complete blood counts, urinalysis, chest X-ray, chemistry profile, electrocardiogram. I also examined Mrs. Rutledge.

. . . . To describe the particular kinds of pulmonary conditions that I am familiar with that exist with some frequency in textile workers, byssinosis is the primary disease associated with textile workers. Byssinosis is a disease which in its acute phase is characterized by symptoms of chest tightness, wheezing, shortness of breath and cough, which typically occur on the first day of the week after returning from the weekend, and initially improve as the work week goes on. Later it is possible to progress into a chronic phase which is indistinguishable from other chronic obstructive pulmonary disease. Based upon my experience and familiarity with the literature I can state whether or not textile workers are at an increased risk of contracting chronic obstructive pulmonary disease. That opinion is that they are. That opinion is irrespective of whether or not the textile worker can relate symptoms of the Monday morning or startup day symptoms I mentioned, since apparently, it is possible to develop chronic obstructive pulmonary disease without having the classical acute phase symptoms. There are other named conditions that would fit within that general category. Chronic obstructive pulmonary disease includes pulmonary emphysema, chronic bronchitis, and possibly asthma.

. . . .

As a result of my objective findings, that is my physical examination and pulmonary function tests and other studies that I had performed, I formulated an opinion regarding Mrs.

Rutledge's capability of physical labor. That opinion was that I felt that she should not work around irritating dust, fumes or smoke, and that she should not be expected to do any type of work requiring significant physical exertion. I felt that she would be able to do sedentary type work in a clean environment assuming that she had the necessary training and other capabilities and that such work were available.

. . . .

As to my diagnosis of Mrs. Rutledge's condition at the time of my examination, it was my feeling that she had pulmonary emphysema, chronic bronchitis, possibly arteriosclerotic heart disease with angina pectoris and congestive heart failure which was then compensated, migraine, urinary incontinence of undetermined etiology, arthralgia of her back and fingers of undetermined etiology, and hypertriglyceredema. I would not expect Mrs. Rutledge's obstructive pulmonary disease to improve significantly; she would probably show progressive impairment with time although this would be influenced in some measure by her therapy.

Q: . . . . Now, based upon these facts and upon your examination and testing of Ms. Rutledge, do you have an opinion satisfactory to yourself to a reasonable medical certainty as to whether Ms. Rutledge's exposure to cotton dust for in excess of 25 years in her employment was probably a cause of her chronic obstructive lung disease which you diagnosed in your report?

A: Yes.

Q: What is that opinion?

A: Yes. That it probably was a cause.

Based upon the same facts and upon my examination and testing of Mrs. Rutledge, I have an opinion as to whether her impairment with respect to her ability to perform labor is related to her pulmonary disease. That opinion is that it is.

. . . .

When I was examining Mrs. Rutledge I got a history from her. This history included her history as to smoking.

She gave me the history that she began smoking at age 15 and averaged one pack of cigarettes daily until she stopped smoking in February, 1979. I think cigarette smoking is a *very important*, often the *primary cause*, of *chronic obstructive pulmonary disease.* Based upon the facts that Ms. Hudson has given me and based upon by examination and particularly upon the history of cigarette smoking that Mrs. Rutledge gave me it is my opinion satisfactory to myself to a reasonable degree of medical certainty is that her history of cigarette smoking could or might have been the cause of her pulmonary emphysema and chronic bronchitis. Based upon my examination and these facts, I would say it was one of the more probable causes. This is after taking into consideration her exposure to cotton dust.

. . . .

. . . In other words at the time of her employment on that date [October 25, 1976] she was suffering from pulmonary emphysema, chronic bronchitis and chronic obstructive pulmonary disease.

. . . .

Q: Do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty as to what effect, if any . . . [the] exposure . . . [at defendant's mill] to Ms. Rutledge would have had to her?

MS. HUDSON: Objection to the form.

A: Yes.

Q: What is that opinion?

A: I think it would be minimal.

Based upon the history of exposure that she gave me of her employment at Kings Yarn, in my opinion the exposure during that two-year period would not be a very substantial exposure; assuming this was in the spinning department and that she was using a synthetic and cotton blend being processed, not having actual dust measurements available. In my opinion her condition of pulmonary emphysema and chronic bronchitis was not caused by *this exposure in this period of*

23 months. I do have an opinion satisfactory to myself and to a reasonable degree of medical certainty as to whether or not this exposure had any affect upon her condition. I think that exposure to any type of dust in someone with pre-existing chronic bronchitis could have some aggravating effect on the underlying condition.

. . . .

Assuming that Mrs. Rutledge was capable of doing her job in October of 1976 at Kings Yarn, and she was exposed to respirable dust of cotton and synthetic yarns at her job at Kings Yarn, and she was unable to do her job at the time she left, I would not have an opinion as to whether her exposure at Kings Yarn aggravated her condition. I feel that whether a person is capable of performing a job or not is quite a subjective matter that is influenced by many factors of physical, emotional and sociological. I would not have an opinion.

I stated that exposure to any kind of dust in an individual with underlying lung disease would have an aggravating effect. It would also be my opinion that in Mrs. Rutledge's individual case, her exposure to respirable cotton and synthetic dust at Kings Yarn would have aggravated her condition.

Our statute relating to occupational diseases is very specific and does not support the majority's conclusion. I need only repeat what this Court said in *Hansel v. Sherman Textiles*, 304 N.C. 44, 51-52, 283 S.E. 2d 101, 105.

G.S. 97-52 provides in effect that disablement of an employee resulting from an 'occupational disease' described in G.S. 97-53 shall be treated as the happening of an injury by accident. This section provides specifically:

The word 'accident' . . . shall not be construed to mean a series of events in employment of a similar or like nature occurring regularly, continuously . . . whether such events may or may not be attributable to the fault of the employer and *disease attributable to such causes shall be compensable only if culminating in an occupational disease mentioned in and compensable under this article.* (Emphasis added.)

G.S. 97-53 contains the comprehensive list of occupational diseases for which compensation is provided in the Act.

By the express language of G.S. 97-53, only the diseases and conditions enumerated therein shall be deemed to be occupational diseases within the meaning of the Act.

Byssinosis is not 'mentioned in and compensable under' the Act, except by virtue of G.S. 97-53, which provides in pertinent part as follows:

> Section 97-53. Occupational diseases enumerated; . . . the following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this Article:
>
> . . .
>
> (13) Any disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

My interpretation of our Act is detailed in *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458. It suffices here to say only that any disease, in order to be compensable, must be an *occupational disease*, or must be *aggravated or accelerated* by an occupational disease or by an injury by accident arising out of and in the course of the employment. G.S. § 97-53(13); *Booker v. Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979); *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951). Today the majority severs this causation link and, in its place, inserts the new principle of "significant contribution." We also said in *Hansel:* "The clear language of G.S. 97-53 is that for any disease, other than those specifically named, to be deemed an 'occupational disease' within the meaning of the Article, it must be 'proven to be due to,' causes and conditions as specified in that statute." *Hansel v. Sherman Textiles*, 304 N.C. at 52, 283 S.E. 2d at 105. I fail to see how the "significant contribution" principle originated in the majority opinion can satisfy the "proven to be due to" requirement of the statute.

Thus far the opinions of this Court have, for the most part, been faithful to the intent of the Legislature when it enacted the

Rutledge v. Tultex Corp.

occupational disease provisions of the statute, *i.e.* —that compensation is to be paid only for disabilities *unmistakably caused by* exposure to causes and conditions peculiar to the workplace rather than for disabilities *more likely than not* to have been caused by exposure to such causes and conditions. *See Walston v. Burlington Industries*, 304 N.C. 670, 285 S.E. 2d 822.

In my view the operative facts of the case *sub judice* are indistinguishable from those in *Walston* and are very close to those of *Morrison* and *Hansel.* This may be demonstrated by the following comparison of the cases:

## Rutledge v. Tultex Corp.

| MORRISON | HANSEL |

### FACTS

Claimant was totally disabled, her disability being due to chronic obstructive lung disease. 50 to 60 percent of her disability was due to cotton dust exposure. Cigarette smoking as a related factor was assigned an etiologic contribution to her total lung disease of 40 to 50 percent. There was no contribution to her disability from her phlebitis, diabetes, sinusitis, or rhinitis. There was other medical testimony that up to 20 percent of her disablement resulted from an occupational disease.

Claimant had a pattern of chronic obstructive lung disease, the components of which were asthma, chronic bronchitis and byssinosis. Every person with asthma will react to cotton dust. Cigarette smoking is certainly a major contributing factor to chronic bronchitis. Diagnosis of byssinosis was made on the basis of chronic obstructive lung disease in a patient with a typical work history of byssinosis and presumably has had exposure to cotton textile dust over a period of time. No determination was made as to the extent of the condition or the weight added to its presence because the symptoms could be explained by the other two conditions.

### FINDINGS

Claimant suffered from chronic obstructive lung disease . . . 50 to 60 percent of her incapacity to work resulting from the disease was caused by exposure to cotton dust while the balance was due to diseases and conditions which were not caused, aggravated, or accelerated by exposure to cotton dust. Another opinion is that she is only 20 percent incapacitated for work and exposure to cotton dust could have caused, aggravated or accelerated as much as 20 percent or as little as none. Phlebitis, varicose veins and diabetes constitute an added factor in causing her incapacity and were not caused, aggravated or accelerated by exposure to cotton dust. That part of claimant's lung disease which is related to her employment is not an ordinary disease of life to which the general public is equally exposed. Claimant is only partially incapacitated for work as a result of conditions which were caused or aggravated or accelerated by exposure to cotton dust.

Claimant has both asthma and byssinosis which are causing her respiratory impairment, which is severe and irreversible. She has byssinosis as a result of her exposure to cotton dust in her employment and this is partly responsible for her disability.

### HOLDING

The Commission's conclusion that claimant was entitled under G.S. 97-30 to compensation for a 55 percent partial disability is correct. The award must be based on that portion of a pre-existing, *non-disabling, non-job-related* condition that is aggravated or accelerated by an occupational disease.

The Court reiterated its position in *Morrison* and held that the medical evidence in the record was not sufficiently definite as to the cause of claimant's disability to permit effective review. The case was remanded.

## Rutledge v. Tultex Corp.

| WALSTON | RUTLEDGE |
|---|---|

## FACTS

Claimant was treated for pulmonary emphysema (chronic pulmonary obstructive disease—pulmonary fibrosis). He was diagnosed as having chronic bronchitis, emphysema, possible intrinsic asthma, and possible byssinosis. Cigarette smoking would most likely play a part in his pulmonary disability. It was the primary etiological agent. He did not have a classical history of byssinosis. With intrinsic asthma he could have noticed an aggravation of his symptoms by cotton dust without necessarily invoking the diagnosis of byssinosis. Exposure to cotton dust could have played a role in the causation of his pulmonary problems, contributory rather than cause and effect.

Claimant was diagnosed as having chronic obstructive pulmonary disease representing a combination of emphysema, and chronic bronchitis. Cigarette smoking is a very important, often the primary cause of chronic obstructive pulmonary disease. It was one of the more probable causes of claimant's disease. Recurrent infection also played a prominent role. She did not give a classical history of byssinosis. It was not possible to rule out cotton dust as playing some role. Exposure to cotton dust was probably a cause of the lung disease. Textile workers are at an increased risk of contracting chronic obstructive pulmonary disease (includes pulmonary emphysema, chronic bronchitis and possibly asthma).

## FINDINGS

During the period beginning 1962 to retirement claimant has been ill due to bronchitis, emphysema, asthma, and chronic pulmonary fibrosis. From an examination, the physician gained the impression that he might also suffer from possible byssinosis. His symptoms appear to be clearly related to pulmonary emphysema and chronic bronchitis and may be, at least in part, related to cigarette smoking. With intrinsic asthma he could have noticed an aggravation of his symptoms by dust in the mill without necessarily invoking the diagnosis of byssinosis. The history of byssinosis is somewhat equivocal.

Cigarette smoking and recurrent infection have played prominent roles in the pulmonary impairment. Cotton dust may aggravate it, but since claimant was showing her symptomatology in problems prior to her employment with defendant employer, exposure at defendant employer has neither caused nor significantly contributed to her disease. She has not contracted chronic obstructive lung disease as a result of any exposure while working with defendant employer.

## HOLDING

The Commission was correct in concluding that claimant did not have an occupational disease. Substantially all of the competent medical evidence tended to show that he suffered from several ordinary diseases of life to which the general public is equally exposed, none of which were caused, aggravated or accelerated by an occupational disease.

Rutledge v. Tultex Corp.

The fallacy of the "significant contribution principle" and the majority's disregard of the causal effect of non-occupational factors, arises from the failure to attach significance to the following facts:

I. "Chronic obstructive lung disease" is not a specific disease but rather a term which describes one or a combination of several obstructive pulmonary diseases including chronic bronchitis, emphysema, asthma (ordinary diseases of life), and byssinosis (the only such component which is occupational in origin).

II. Medical science has no reliable means of distinguishing the cotton-dust-related occupational disease of byssinosis in its chronic phase from other obstructive pulmonary diseases caused by non-occupational factors.

III. Physicians rely primarily on the "classical history" of byssinosis in diagnosing that occupational disease. No such history was present here.

IV. Where, as in the present case, claimant's obstructive lung disease is not solely due to byssinosis, but in fact the byssinosis component is absent, there can be no causal connection between claimant's lung disease and her disability. If non-occupational disease components are present and these components are aggravated or accelerated by an occupational disease, it must then be determined *what percentage* of claimant's disability is due to the non-occupational diseases which were aggravated or accelerated by an occupational disease or by causes and conditions characteristic of and peculiar to the workplace. *Hansel v. Sherman Textiles,* 304 N.C. 44, 283 S.E. 2d 101.

V. At least one component of claimant's obstructive lung disease, emphysema, was not aggravated or accelerated to any degree by her exposure to cotton dust.

VI. While claimant's disability was due in part to her lung disease, the components of which were pulmonary emphysema and chronic bronchitis, her diagnosis also included several significant non-lung related diseases and conditions including "possibly arteriosclerotic heart disease with angina pectoris and congestive heart failure which was then compensated, migraine, urinary incontinence of undetermined etiology, arthralgia of the back and fingers of undetermined etiology and hypertriglyceredema."

I now address each of the six factors *seriatim:*

## I

The case at bar cannot be distinguished from *Morrison,* and *Hansel,* by the "word trick" of saying, as does the majority opinion, that in those cases the Court's emphasis was on "byssinosis" whereas here the emphasis is on "chronic obstructive lung disease." If one examines the medical testimony in the cases rather than the "emphasis of the court," it is apparent that no such distinction is justified. Even a cursory reading of the summary of the cases reveals the lack of distinction urged by the majority. The majority opinion here simply mischaracterizes *Morrison* and *Hansel* as being "byssinosis" cases and thus somehow different from "chronic obstructive lung disease cases."

"Chronic obstructive lung disease" is not a specific "disease" in and of itself. It is merely a shorthand description of one or a combination of several obstructive pulmonary diseases which may include, but may not be limited to, chronic bronchitis, emphysema, asthma, byssinosis, etc., which have similar pathologic results such as tightness in the chest, shortness of breath, small airway obstruction and production of sputum.

The majority opinion does however correctly state the holding of the two cases as follows:

> Thus both *Morrison* and *Hansel* hold that when byssinosis is the occupational disease in question and causes a worker to be partially physically disabled, and other infirmities, acting independently of and not aggravated by the byssinosis, also cause the worker to be partially physically disabled, the worker is entitled to compensation for so much of the incapacity for work as is related to the physical disability caused by the occupational disease.

What the majority opinion fails to recognize is that the same holding applies whether we use the term "byssinosis" or substitute therefor the words "chronic obstructive lung disease." It is clear from the facts in *Morrison* and *Hansel* that this Court was indeed addressing itself in both those opinions to "chronic obstructive lung disease."

## II

In the records of cases which reach this Court we are repeatedly told by medical experts that the symptoms of cotton-dust-related occupational disease (*i.e.* byssinosis) are generally the same as those of ordinary diseases of life caused by non-occupational factors. A chronically disabled victim of byssinosis exhibits the same breathing difficulties as a person who has never been exposed to cotton dust but who has asthma, chronic bronchitis or emphysema. As pointed out by the majority opinion, the respiratory systems of both will appear the same on autopsy. What the majority opinion fails to point out is that both will look similar on x-ray film and they will perform the same way on pulmonary function tests. The truth is simply that medical science has no reliable means of distinguishing the cause of the disease in its chronic phase.

As pointed out by the majority opinion, Dr. Reginald T. Harris, also a pulmonary specialist and, like Dr. Williams, a member of the Industrial Commission's Textile Occupational Disease Panel, testified in *Hansel* that "[p]eople who have byssinosis for many years, have a lung disease that is indistinguishable from chronic bronchitis." *Hansel v. Sherman Textiles*, 304 N.C. at 57, 283 S.E. 2d at 108. In the case before us, Dr. Williams testified that it is possible for byssinosis "to progress into a chronic phase which is indistinguishable from other chronic obstructive pulmonary disease."

Dr. Williams testified in *Walston* that:

There is not specifically any objective finding to say that a man does or doesn't have byssinosis that you could put your finger on, such as a biopsy or autopsy, such as with silicosis and asbestosis, although in the early stages one can demonstrate a reactivity to the dust by doing pulmonary function studies before and after six hours exposure to the work environment. But in the latter stages, such as one might see with chronic obstructive pulmonary disease, this is no longer valid and these are not specific diagnostic criteria. Therefore, any diagnosis I am making of Mr. Walston is predicated almost entirely, if not entirely, upon his history and subjective findings.

R. p. at 18.

## III

In *Walston* Dr. Williams explained the type of "classic history" usually employed and primarily relied upon in diagnosing byssinosis:

> For the record, 'classic history' of byssinosis, that of textile workers, is that after having worked for several years, the worker begins to notice symptoms on Monday morning, after being back at work for a short period of time, symptoms of chest tightness, shortness of breath, sometimes coughing, wheezing and sputum production, the symptoms usually being improved on Tuesday and the rest of the week, but after a number of years the symptoms become more persistent throughout the rest of the week, until finally the symptoms are more or less chronic. This history is part of the diagnosing of byssinosis.

*Walston v. Burlington Industries*, 304 N.C. at 672-73, 285 S.E. 2d at 824. In *Walston* Dr. Williams, referring to the claimant Walston, testified "[t]his man did not have a completely classical history." *Id.* at 673, 285 S.E. 2d at 824. In the case now before us, referring to the claimant Rutledge, he testified "[i]t is not possible to completely exclude cotton dust as playing some role in causing an irritative bronchitis but she does not give a classical history of byssinosis."

## IV

With such heavy dependence on the "classical history" in diagnosing byssinosis and the total absence of such a history by Mrs. Rutledge, Dr. Williams' reluctance to state unequivocally that the inhalation of cotton dust "caused" claimant's chronic obstructive lung disease is understandable. He would only testify, as the majority readily admits, that Mrs. Rutledge's exposure to cotton dust "probably was *a* cause" of her chronic obstructive lung disease and that "her impairment with respect to the ability to perform labor is *related to* her pulmonary disease." Even these tentative statements were, as the majority admits, based upon a hypothetical which omitted a factor which Dr. Williams considered "very important," *i.e.*, some approximately thirty years of relatively heavy cigarette smoking. He subsequently testified:

When I was examining Mrs. Rutledge I got a history from her. This history *included her history* as to smoking. She gave me the history that she began smoking at age 15 and averaged one pack of cigarettes daily until she stopped smoking in February, 1979. *I think cigarette smoking is a very important, often the primary cause, of chronic obstructive pulmonary disease.* Based upon the facts that Ms. Hudson has given me and based upon my examination and particularly upon the history of cigarette smoking that Mrs. Rutledge gave me it is my opinion satisfactory to myself to a reasonable degree of medical certainty is that *her history of cigarette smoking could or might have been the cause of her pulmonary emphysema and chronic bronchitis.* Based upon my examination and these facts, I would say it *was one of the more probable causes.* This is after taking into consideration her exposure to cotton dust.

(Emphasis added.)

It should be noted that while Dr. Williams said claimant's exposure to cotton dust "probably was a cause," it is obvious that he felt, and he so testified, that cigarette smoking was "one of the more probable causes." From this evidence emerges the indisputable fact that under our holdings in *Morrison* and *Hansel*, this case could at best be remanded for findings as to the percentage contribution of non-occupational diseases and factors to claimant's disability. However, to its new concept of "significant contribution" the majority adds that there can be full recovery "even if other non-work-related factors also make significant contributions, or were significant causal factors." This latter provision flies fully in the face of our recent decisions in *Morrison, Hansel* and *Walston* and essentially overrules those cases.

I do not wish to be interpreted as saying that a claimant suffering from chronic obstructive lung disease may never recover for disability resulting from that condition. Chronic obstructive lung disease may be compensable in whole or in part if: (1) it is due solely to byssinosis or (2) byssinosis is one of several components (together with other ordinary diseases of life such as chronic bronchitis, asthma, emphysema) and conditions of the workplace materially aggravate or accelerate these other components, in which case it must be determined (a) what percentage

of the disability is compensable due to byssinosis, (b) what percentage is compensable due to the other components which have been materially aggravated or accelerated by the inhalation of cotton dust and (c) what percentage is due to non-compensable causes unrelated to the work environment (for instance, recurring infections, cigarette smoking, etc.).

V

At least one component of claimant's obstructive lung disease, emphysema, was not aggravated or accelerated to any degree by her exposure to cotton dust. It seems to be widely accepted by the medical experts in the field that the inhalation of cotton dust aggravates pre-existing bronchitis but does not aggravate emphysema. Perhaps this can be demonstrated by a quotation from a paper presented at the International Conference on Byssinosis by Phillip C. Pratt, M.D., F.C.C.P. of the Department of Pathology, Durham Veterans Administration and Duke University Medical Center, Durham:[1]

> It seems important to identify emphysema in the cotton worker population. Bronchitis and emphysema each can cause COPD and enhance the degree of obstruction produced by the other. The lesions in bronchi shown here to be significantly associated with cotton mill work are generally agreed to be morphologic correlates of clinical bronchitis. Since they represent hyperplastic or metaplastic epithelial changes occurring in response to an irritant in the mill atmosphere, and since such epithelial changes are well known from studies of exsmokers to be at least partially reversible, with associated functional improvement, one might predict that removing from the mill a symptomatic cotton worker whose lungs were not emphysematous should result in gradual restoration toward normal epithelium and reduction of the symptoms. Such a sequence of events has been observed repeatedly, although not frequently reported.

1. An International Conference on Byssinosis, attended by experts on the subject from throughout the world was held in Birmingham, Alabama, in April, 1981. Some approximately thirty-five of the papers presented at that conference are collected and published in the official publication of the American College of Chest Physicians—CHEST for Pulmonologists, Cardiologists, Cardiothoracic Surgeons and Related Specialists, Volume 79/number 4/April 1981 Supplement. Dr. Pratt's article appears at page 49S and the quotation appears on page 51S.

On the other hand, the destructive lesions of emphysema are not reversible. Thus, removal of such a patient from the mill may not result in disappearance of the symptoms, and the functional impairment may well persist and produce permanent disability. However, since the mill exposure could not have been responsible for the emphysema, the irreversible impairment should not be attributed to the occupational exposure.

. . . .

Second, can any rationale be proposed to explain the fact that cotton mill work does not cause pulmonary emphysema? It is now recognized that the destructive process involving alveolar walls in emphysema is probably a local effect produced by proteolytic enzymes probably derived from inflammatory cells. Cigarette smoke is almost ideally suited to provide the stimulus for such cellular reaction in alveoli, since the particulate material is in such a uniform minute size range, namely 0.2 to 1 [microns]. Thus an appreciable portion of the total material can reach alveoli both by mass movement of inhaled air and by diffusion. In contrast, the size range of fibers and particles in a mill atmosphere ranges from 0.3 to 25 [microns], with a median size of 7 [microns]. The particles are more likely than cigarette smoke to be impinged onto bronchial surfaces, and the smaller end of the size range, which can move by diffusion, constitutes only a minute portion of the total mass. Thus, little or no cotton dust can reach the alveoli to produce the excessive cellularity that has been shown to occur in cigarette smokers. The absence of excess pulmonary pigmentation in the lungs of the cotton workers . . . supports this reasoning.

This being so it must be conceded that whatever portion of the claimant's chronic obstructive pulmonary disease is due to emphysema, it was not contributed to in any degree by her exposure to cotton dust. This alone demonstrates the fallacy of grouping all lung diseases under one name, "chronic obstructive lung disease," and making that "disease" compensable if any part of it was "significantly contributed" to by the inhalation of cotton dust.

VI

The majority today departs from our longstanding precedent by allowing recovery of benefits when causes and conditions of the workplace "significantly contribute" to any ordinary disease of life which results in a disability. An attempt is made to justify this departure from our statute and the case law by this statement from the majority opinion:

> All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded. *Booker v. Duke Medical Center, supra,* 297 N.C. at 472-75, 256 S.E. 2d at 198-200. Thus, the first two elements are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally. *Id.* 'The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation.' *Id.* at 475, 256 S.E. 2d at 200.

The majority obviously believes that the testimony of Dr. Williams to the effect that the mere exposure to cotton dust creates an increased risk of lung disease somehow establishes that all of Mrs. Rutledge's diseases (including, we must assume, her many non-lung related diseases) are "occupational diseases" provided any "significant contribution" to those diseases by the cotton dust can be established. This position was rejected by the majority opinion in *Morrison.* I find it shocking that a disability from this range of diseases and conditions, most of which are ordinary diseases of life, would be fully compensable because of the "significant contribution" to only the lung conditions by the inhalation of cotton dust. While her non-lung related conditions did not contribute to her pulmonary conditions, it is inescapable that they contributed to her disability.

Nor do I find it unusually significant, as does the majority, that Dr. Williams was of the opinion that textile workers are "at an increased risk of contracting chronic obstructive pulmonary disease," which according to Dr. Williams includes "pulmonary emphysema, chronic bronchitis and possibly asthma" as well as byssinosis. We are repeatedly told by expert medical witnesses

that the same is true of cigarette smokers and others who may be in no way connected with the textile industry. We are even told that the same is true of those exposed to concentrations of ordinary household or yard dust. It is interesting that in this very case Dr. Williams testified: "I think that exposure to *any type of dust* in someone with pre-existing chronic bronchitis could have some aggravating effect on the underlying condition." He also said "I stated that exposure to *any* kind of dust in an individual with underlying lung disease would have an aggravating effect." (Emphasis added.) It is indeed on the basis of the last quoted sentence that the majority opinion characterizes Dr. Williams as saying "that such exposure as she had at Kings Yarn 'could have some aggravating effect on [her] underlying condition.'" As is obvious, this characterization of that testimony is completely misleading.

This particular case is one wherein the claimant has failed to meet her burden of proof that she has a compensable claim. *Henry v. Leather Co.*, 231 N.C. 477, 57 S.E. 2d 760 (1950). The evidence does not establish the claim. In cases where there is continuing medical difficulty in determining the etiology of disease and injury, compensation awards cannot be sustained in the absence of expert medical testimony on the matter of causation. *See Click v. Freight Carriers*, 300 N.C. 164, 265 S.E. 2d 389 (1980); *see also Gillikin v. Burbage*, 263 N.C. 317, 139 S.E. 2d 753 (1965). In the present case, the expert testimony does not establish the claim of occupational disease. *See Walston v. Burlington Industries*, 304 N.C. 670, 285 S.E. 2d 822.

The majority opinion attempts to distinguish the case *sub judice* from *Walston* because in *Walston* the term "possible" is used while the word "probable" is used in the present case. It is a distinction without a difference. A mere "probability" of causation is no more substantial or sufficient than a mere "possibility." The fact that the medical witness testified that claimant's exposure to cotton dust in her twenty-five years of employment *"probably"* was *a* cause of her chronic obstructive lung disease but that "cigarette smoking" was one of the *more* probable causes . . . after taking into consideration her exposure to cotton dust (emphasis added) does not take the causation effect out of the realm of speculation. In *Walston* Dr. Williams testified that claimant's exposure to cotton dust "could *possibly have played a role* in the

causation of his pulmonary problems" whereas here Dr. Williams testified that such exposure *"probably was a cause."* (Emphasis added.) Moreover, as to Mrs. Rutledge, Dr. Williams further testified that "[i]t is *not possible to completely exclude* cotton dust as playing some role in causing an irritative bronchitis *but she does not give a classical history of byssinosis."* This latter statement, of course, is essentially the same as the statement in *Walston* that "[t]his man did not have a completely classical history."

Claimant has failed to prove that an "occupational disease" caused her disability. She has failed to show that her "chronic obstructive lung disease" is an occupational disease within the meaning of our statute. Had this case been tried and decided on the basis of aggravation and acceleration of a pre-existing condition by causes and conditions of the workplace, an award of compensation benefits might have been justified. The theory insisted upon by the claimant, and adopted by the majority, that her ordinary diseases of life were somehow transformed into an "occupational disease" by the "significant contribution" of causes and conditions of the workplace, is, to say the least, new law in this jurisdiction and will no doubt come as a shock to our legislators as somehow being within their intent.

Surely some assessment must be made of the percentage of claimant's disability, if any, due to her emphysema as well as her arteriosclerotic heart disease, angina pectoris, congestive heart failure, migraine, arthralgia, and hypertriglyceredema.

I believe this Court in *Hansel* (where there were only lung conditions) gave the Industrial Commission good advice as to what it must consider in cases like this:

In cases in which a claimant has other infirmities related solely to the lungs or respiratory system, the Commission should, as a matter of course, consider whether claimant's disablement (*i.e.* inability to work and earn wages) results from aggravation of those other non-occupational diseases or infirmities by causes and conditions peculiar to claimant's employment.

. . . .

Rutledge v. Tultex Corp.

In order for the Court to determine whether the Commission's findings and conclusions are supported by competent evidence, the record before us must [contain] medical testimony to indicate answers to the following questions:

(1) Is plaintiff totally or partially incapacitated to work and earn wages? If partial, to what extent is she disabled; *i.e.*, what is the percentage of her disability?

(2) What disease or diseases caused this disability?

(3) Which of the plaintiff's disabling diseases are occupational in origin, *i.e.*, which diseases are due to causes and conditions which are characteristic of and peculiar to plaintiff's occupation as distinguished from ordinary diseases of life to which the general public is equally exposed outside of the employment?

(4) Does plaintiff suffer from a disabling disease or infirmity which is not *occupational* in origin, *i.e.*, which is not due to causes and conditions characteristic of and peculiar to plaintiff's occupation as distinguished from ordinary diseases of life to which the general public is equally exposed outside of the employment?

If so, specify the non-occupational disease(s) or infirmities?

(5) Was plaintiff's non-occupational disease(s) or infirmity aggravated or accelerated by her occupational disease(s)?

(6) What percentage of plaintiff's incapacity to work and earn wages results from (a) her occupational disease(s) or (b) her non-occupational disease(s) which were aggravated or accelerated by her occupational disease(s)?

(7) What percentage of plaintiff's incapacity to work and earn wages results from diseases or infirmities which are non-occupational in origin?

*Hansel v. Sherman Textiles*, 304 N.C. at 53, 58-59, 283 S.E. 2d at 106, 109 (1981).

The case should *not* be remanded for the purpose of applying the new "substantial contribution" principle — if it is to be remanded at all it should be for the purpose of apportionment of

Dept. of Correction v. Gibson

Mrs. Rutledge's disability to work-related and non-work-related causes.

I agree with the majority's conclusion that it is not necessary that Mrs. Rutledge show that the conditions of her last employer's workplace were the *sole* causes of her disability and that it is only necessary for her to show that the conditions of her last employer's workplace "augmented the disease to any extent, however slight."[2] I vote to affirm the opinion of the Court of Appeals and to modify it to the extent necessary to correct this error.

Chief Justice BRANCH and Justice COPELAND join in this dissent.

---

2. I must point out, however, what I consider to be a significant omission in the majority's statement that "She need only show: (1) that she has a compensable occupational disease and (2) that she was 'last injuriously exposed to the hazards of such disease' in defendant's employment." The omission from (1) that the occupational disease be the cause of her disability is fatal and will come back to haunt us. The first requirement should be accurately stated as follows: "that she has an occupational disease which caused her disability."