The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
Following the 9 February 1995 hearing, the depositions of Drs. Stephen Naso, Robert McBride, Paul Perlik, J. Eugene Alexander, and John Gaul were admitted into the record.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the Pre-Trial Agreement, filed on February 9, 1995, and at the hearing as:
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the employment relationship existed between the parties at all relevant times.
2. Lumbermen's Mutual Casualty Insurance Company was the carrier on the risk.
3. June 11, 1991 is the date of the injury giving rise to this claim.
4. Plaintiff's last day of work for defendant-employer was August 19, 1993.
5. The plaintiff's average weekly wage was $302.00, which yields a compensation rate of $201.34.
6. The issues for determination are:
 a. Whether the plaintiff sustained a compensable injury to her hands;
 b. If the plaintiff sustained a compensable injury, to what benefits is she entitled;
 c. Whether the plaintiff is entitled to have defendants pay for unauthorized medical care; and
 d. Whether defendants are entitled to a credit for salary continuation benefits paid to plaintiff.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. At the time of the 9 February 1995 hearing, the plaintiff was a forty-five year old female high school graduate who had taken business and computer keypunch classes at the local community college.
2. The plaintiff worked as a motel housekeeper, thread winder, clerical worker, and clothes sorter prior to beginning her employment with defendant-employer in December of 1974.
3. Plaintiff initially worked on the ToastChee belt, where she picked up rows of crackers to feed them into the machine and putting packaging in the machine. The plaintiff performed this job for two years. Next, the plaintiff worked on the candy line where she picked up suckers from a belt and packed them, fifty per box. The plaintiff performed this job for twenty months. She returned to the ToastChee line for two months.
4. In 1979, the plaintiff began working in the peanut department, where she packed bags of peanuts in one hundred-count boxes.
5. In 1990, the plaintiff moved to the saltine department where she packed saltine packets in boxes and fed crackers into a machine to be packaged. The plaintiff worked an eight-hour shift, during which she had a ten-minute break, twenty-five minute lunch and fifteen-minute break. The plaintiff alternated between the feeding and packing jobs.
6. On the feeding job, the plaintiff would stack crackers about twenty-five per stack to feed into the machine, feeding ten to twelve stacks of crackers per minute into the machine to be wrapped in cellophane-type paper. This function requires the employee to gather up approximately 25 loose crackers at a time from a conveyor belt, stack them together and place the stack in a machine where the crackers would be wrapped in cellophane wrappers with two individual crackers in each wrapper. The crackers are fragile, therefore, the worker must handle them with care. Nonetheless, the worker is expected to gather up and feed 10-12 stacks, of saltines or 8-9 stacks of sesame crackers into the machine per minute.
7. The other function in the Saltine department is to pack the crackers in boxes after they are wrapped. To perform this job, the worker is required to retrieve a box off of a conveyor belt that is situated about eye-level, place the box in front of him or her, and fill the box with 300 individual packages of saltine (or 200 packages of sesame crackers) with each package containing two crackers.
8. On the packing side, the employee gathers up about 25 packages of saltine at a time placing them in the box to form one row; that each box holds 12 rows; that the employee packs 40-43 boxes per hour; that it takes a little over a minute to fill a box; and that the employee has to reach for an empty box every 1-1.6 minutes.
9. Based on the testimony of the plaintiff, the plaintiff's demonstration of the hand movement required in the Saltine department, and the testimony of the medical experts, the jobs in the Saltine department worked by plaintiff require rapid, repeated flexion and extension movements of the hands. During a typical eight-hour shift, an employee will rotate between the feeding side and the packing side every two hours, with a 10 minute break after the first rotation, a lunch break after the second rotation and a 10 minute break after the third rotation.
10. On or about June 11, 1991, Ms. Dailey's right hand started hurting and swelling, and a knot came up on the back of her hand. She reported this to her supervisor and asked to go to see the plant nurse. She was permitted to start seeing the nurse, who would put hot towels on her hand. This went on for several weeks before Lance, Inc., sent her on 12 July 1991 to see the company's doctor, Dr. Stephen J. Naso, Jr., M.D.
11. The plaintiff complained of swelling and pain in her right hand to Dr. Naso, who authorized the plaintiff to be placed in light duty, and he ordered hot wax therapy, splints and Naprosyn. Dr. Naso was of the opinion that plaintiff had synovitis. At the time Dr. Naso was treating Ms. Dailey, he was seeing 15-20 people every two weeks from Lance who had the same job and the same types of complaints as Ms. Dailey.
12. On August 9, 1991, plaintiff complained of numbness in her small finger, and pain in the base of the palm to the finger. Dr. Naso ordered an additional week of light duty work.
13. On or about August 10, 1991, the plaintiff self-referred to Dr. John Alexander, after she was dissatisfied with Dr. Naso. Dr. Alexander diagnosed plaintiff as having ulna tunnel syndrome at the right elbow and early DeQuervain's disease of the right wrist. Ms. Dailey's complaints to Dr. Alexander were that she had been experiencing pain and numbness in the little and ring fingers of her right hand and also pain over the radial aspect of the right wrist since June, 1991; that she had been treated by the company nurse and the company doctor, Dr. Naso; and that Dr. Naso had released her to return to work, but that she was no better at that time than she was when she first went to see Dr. Naso.
14. Dr. Alexander conducted a physical examination of Ms. Dailey which revealed that she had radiculopathy in the ulna distribution of the fourth and fifth fingers of her right hand. Dr. Alexander's diagnosis was "ulna tunnel syndrome, rule out ulna nerve neuropathy and early Dequervain's disease, right wrist."
15. Dr. Alexander referred Ms. Dailey to the Demas Neurological Clinic for an EMG and nerve conduction velocity studies of the ulna nerve on the right. The EMG was done on 8-22-91, and it showed that Ms. Dailey had ulna compression neuropathy at the elbow and marked compression neuropathy at the wrist, i.e., the ulna nerve was under pressure at both the elbow and wrist and that was giving Ms. Dailey the numbness in the two fingers. Dr. Alexander saw Ms. Dailey again on 9-13-91, reviewed the results of the EMG with her and scheduled the patient for an ulna nerve transposition of the elbow to be done the last week of September. However, the ulna nerve transposition was never done by Dr. Alexander as Ms. Dailey returned to the care of Dr. Naso in October of 1991.
16. Based on Dr. Alexander's deposition testimony, the Full Commission finds that the plaintiff's work at Lance made her more susceptible than members of the general public to the occupational diseases which he treated and, since she did not suffer these diseases prior to working with Lance, her employment at Lance significantly contributed to or was a significant causal factor in the diseases' development.
17. On November 2, 1991, Dr. Naso found plaintiff to be tender over the medical epicondyle and having a positive Tinel's sign. Plaintiff complained of tingling and numbness going down the forearm to the small fingers. Dr. Naso was of the impression that plaintiff had cubital tunnel syndrome, or compression of the ulnar nerve. He ordered cubital splint and continued light duty. Dr. Naso referred plaintiff to Dr. Warren Burrows, his partner, for a second opinion.
18. On December 2, 1991, Dr. Burrows examined the plaintiff and recommended continued conservative treatment after the objective findings failed to reflect a positive Tinel's sign at either the wrist or elbow.
19. Dr. Burrows concurred with Dr. Naso's recommendation that surgery was not indicated in plaintiff's condition. On December 9, 1991, Dr. Naso authorized plaintiff to return to either regular or light work and to return to see him in three months.
20. The plaintiff was out of work from January 22 through 27, 1992 due to the left knee pain. On January 28, 1992, the plaintiff was injured in an automobile accident; and she remained out of work through March 13, 1992 due to the back spasms and sprain, left wrist sprain and left knee sprain.
21. On March 17, 1992, the plaintiff returned to Dr. Naso at which time she complained of continued tingling and numbness in the ulnar nerve. Dr. Naso injected the elbow and ordered light duty. Upon return visit on April 7, 1992, Dr. Naso opined that plaintiff could return to regular or light work.
22. In May of 1992, the plaintiff complained to Dr. Burrows, of a popping in her right wrist. She was diagnosed with mild tenosynovitis.
23. On June 2, 1992, the plaintiff returned to Dr. Naso where she complained of tingling and numbness in her fingers. Dr. Naso noted evidence of carpal tunnel syndrome.
24. Dr. Naso referred the plaintiff to Dr. Paul Perlik due to the changing symptoms. Dr. Perlik noted that nerve conduction studies did not show significant abnormality.
25. On October 6, 1992, plaintiff returned to Dr. Naso, at which time she complained of bilateral hand pain, elbow pain, weakness, and tingling in the hand. At that time, Dr. Naso rendered an opinion that plaintiff might not be able to return to her regular job as a packer.
26. On February 9, 1993, the plaintiff sought treatment from Dr. Robert McBride without authorization from the defendants. After an examination, Dr. McBride determined that the plaintiff had bilateral carpal tunnel syndrome. He noted that plaintiff had a hypo-collagen problem which might cause problems with healing. Dr. McBride performed decompression of ulnar and median nerves at the right wrist on March 29, 1993.
27. On May 5, 1993, Dr. McBride advised the plaintiff that her carpal tunnel syndrome was probably caused by tendonitis in her arm; and the possible ehler-danlos syndrome could be indirectly related.
28. Dr. McBride referred the plaintiff to Dr. John Gaul for work hardening; and on August 20, 1993, Dr. Gaul performed a left carpal tunnel release and ulnar nerve release. Plaintiff was released to light work on November 16, 1993.
29. The plaintiff was involved in an automobile accident on December 21, 1993. Dr. McBride noted on January 11, 1994 that plaintiff would have been able to return to work at that time had she not had the auto accident. Following the auto accident, the plaintiff complained of hand pain. Dr. Gaul noted that plaintiff could return to light work.
30. Dr. Gaul noted on February 8, 1994, that there were multiple factors involved in the causation of plaintiff's problems. He noted that the plaintiff's arthritic complaints existed over a number of years, and it was unclear as to whether it could be attributed to the Lance packing job.
31. On March 1, 1995, Dr. Gaul rated plaintiff as having a five percent permanent impairment of each the left and right hand due to her occupational diseases but he determined that plaintiff was capable of light duty work, avoiding repetitive activity.
32. The plaintiff received short-term disability benefits through an employer-funded program which paid in excess of two-thirds of her regular wage for the thirteen-week period in 1993, after both surgeries.
33. The plaintiff began receiving long-term disability benefits through Unum on February 26, 1994, through an employer-funded program. The plaintiff received $594.15 per month.
34. Since Dr. Gaul had ordered that plaintiff not return to regular duty but try light duty work with a lifting restriction of five pounds and since Lance made no light duty work available, plaintiff felt she had no choice but to retire on March 4, 1994, and she began being paid $400.00 per month in retirement benefits under an employer-funded plan.
35. Since her forced retirement, the plaintiff has worked through Kelly Temporary Services, where she assisted elderly people in their homes by performing household chores such as dusting, washing dishes, making beds, and vacuuming. The plaintiff worked eight hours per day at $6.25 per hour, for $50.00 per week. The plaintiff testified that the work with Kelly Services caused her arms to become numb and to hurt.
36. Based on Dr. Alexander's opinion, the Full Commission finds that the saltine job exposed plaintiff to a greater risk of contracting compression neuropathies than the general public and since she first complained about the conditions for which he treated her after she was working for some time at Lance, her job significantly contributed to or was a significant causal factor in the development of the conditions for which he treated her.
37. Dr. Gaul expressed a similar opinion as did Dr. Naso.
38. The greater weight of competent medical evidence supports a finding that plaintiff's ulnar neuropathy and/or carpal tunnel syndrome were due to causes and conditions related to her employment. The Full Commission finds that her employment exposed plaintiff to a greater risk of contracting her occupational diseases than the public generally and that the employment significantly contributed to or was a significant causal factor in the diseases' development.
* * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. The plaintiff has carried the burden of proof to establish by competent medical evidence that the saltine job significantly contributed to her occupational disease within the meaning of N.C. GEN. STAT. §97-53 (13). To be compensable as an occupational disease pursuant to G.S. 97-53(13), the disease
 must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [claimant's] employment.
Rutledge v. Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983) (quoting Hansel v. Sherman Textiles, 304 N.C. 44, 52,283 S.E.2d 101, 106 (1981). Medical testimony established all three elements.
2. Pursuant to N.C. GEN. STAT. § 97-25, the plaintiff's treatment by Dr. McBride, Dr. Gaul and Dr. Alexander, although unauthorized, was necessary to effect a cure, provide relief, or lessen plaintiff's period of disability. Therefore, the defendants are liable for this treatment.
3. Plaintiff is entitled to temporary total disability compensation of $201.34 per week for each week she was unable to work by reason of her occupational disease contracted at Lance from 11 June 1991 through 1 March 1995, the date she was rated with 5% impairment of both wrists by Dr. Gaul, and was released to return to work on a light duty basis.
4. Plaintiff was never offered a job within her restrictions and she has cooperated by finding another job, although it is intermittent in nature, through Kelly Temporary Services.
5. Plaintiff is entitled to temporary partial disability compensation of 2/3 of the difference between her average weekly wage and the wages she actually earned for those weeks she was able to find employment.
6. Both the temporary total disability payments for those weeks she is unable to find employment and the temporary partial disability compensation payments for those weeks she is able to find employment shall continue until further order of the Commission.
7. Since the payments of temporary total disability and payments of temporary partial disability are likely to aggregate to more than the permanent partial disability rating of 5% to each hand, plaintiff shall be held to have made an election to take the former instead of the latter.
8. Defendants are entitled to a credit for short and long-term disability compensation pursuant to N.C. GEN. STAT. § 97-42.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of Deputy Commissioner Dollar and enters the following:
AWARD
1. Subject to an attorney's fee awarded herein; defendant shall pay to plaintiff in one lump sum, without commutation, the temporary total disability and the temporary partial disability to which she is entitled up to the date of this Opinion and Award.
2. Thereafter, defendants shall pay to plaintiff temporary partial disability compensation and temporary total disability, as appropriate, on a weekly basis, subject to the attorney's fee hereafter discussed, until such time as the Commission orders otherwise.
3. A reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff herein is hereby approved for plaintiff's counsel. Such fee shall be deducted from this award and forwarded directly to plaintiff's attorney.
4. Defendants shall pay all reasonable and necessary medical expenses incurred or to be incurred by plaintiff as a result of her compensable occupational disease when bills for same are submitted to Defendant Employer and approved pursuant to procedures established by the Commission, for so long as such medical treatments are reasonably required to give relief, effect a cure or lessen plaintiff's disability.
5. Defendants shall receive appropriate credit for short and long-term disability compensation pursuant to N.C. GEN. STAT. § 97-42.
6. Defendant shall pay the costs due this Commission.
 S/ ______________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________________ J. HOWARD BUNN, JR. CHAIRMAN
DISSENTING:
S/ ______________________________ DIANNE C. SELLERS COMMISSIONER