* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. That the parties are subject to and bound by the provisions of the Workers' Compensation Act and that the Commission has jurisdiction over the parties and subject matter.
2. That an employee-employer relationship existed between plaintiff and defendant-employers at the time of plaintiff's alleged contraction of an occupational disease.
3. That all parties have been correctly designated, and that there is no question as to misjoinder or non-joinder of parties.
4. The parties stipulate and agree that plaintiff's average weekly wage with Wake County at the time of the alleged contraction of an occupational disease was $1,078.88, which yields a maximum workers' compensation rate of $654.00. Plaintiff last worked for Wake County on March 18, 2002.
5. The parties have stipulated Form 22 for the determination of plaintiff's average weekly wage with Apex EMS at the time of the alleged contraction of an occupational disease. Plaintiff last worked for Apex EMS on March 22, 2002.
6. At Hearing, the parties stipulated to the following documents which were received into evidence as stipulated exhibits:
 • Stipulated Exhibit 1, Joint Pre-Trial Agreement;
 • Stipulated Exhibit 2, medical records for Dr. Gilmer;
 • Stipulated Exhibit 3, medical records for Dr. Hoffmeier;
 • Stipulated Exhibit 4, medical records for Durham Clinic;
 • Stipulated Exhibit 5, IME report from Dr. Venters;
 • Stipulated Exhibit 6, Industrial Commission Forms;
 • Stipulated Exhibit 7, Plaintiff's job search information;
 • Stipulated Exhibit 8, discovery responses;
 • Stipulated Exhibit 9, business and tax records for Williams Construction;
 • Stipulated Exhibit 10, employment and payroll records from Apex EMS;
 • Stipulated Exhibit 11, employment records from Wake County;
 • Stipulated Exhibit 12, Plaintiff's retirement information from the State;
 • Stipulated Exhibit 13, Wake County EMS call log; and
 • Stipulated Exhibit 14, Apex EMS call logs.
At Hearing, the Deputy Commissioner also received into evidence plaintiff's Exhibit 1 (call logs).
 * * * * * * * * * * *
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff Nelson Williams (DOB: April 10, 1955), began working as an EMT for County of Wake in 1980. By 1984 or 1985, plaintiff had progressed to the position of paramedic with County of Wake. Plaintiff continued working as a paramedic for Wake County until March 18, 2002.
2. During his tenure as a paramedic with Wake County, plaintiff generally worked a 24-hour shift with the next 24 hours off, and then he worked for a 72-hour period after which he would have four days off, and then said schedule would begin again on the fifth day. At Wake County, plaintiff worked with a partner, and he and his paramedic partner would alternate between being the attending paramedic or the driving paramedic. Plaintiff and his paramedic partner carried certain emergency equipment to each emergency call, but they would divide the responsibility for carrying that equipment. Specifically, the attending paramedic would take the jump kit and the monitor, while the driving paramedic took the oxygen tank which weighed approximately 20 to 25 pounds.
3. In a typical emergency call, the paramedics would make an initial assessment of the patient to determine whether transport to a hospital or to another health care facility would be necessary. If transport was deemed necessary, then the driving paramedic would return to the ambulance for the stretcher, which weighed approximately 75 pounds. The stretcher had wheels and could be rolled on level ground.
4. In many instances, the Fire Department would arrive at the emergency call prior to EMS paramedics, pursuant to the so-called "first responder" program in Wake County. Fire Department personnel often helped to lift patients onto stretchers and to transport the patient back to the ambulance. On some occasions, Fire Department personnel would accompany the patient in the ambulance while en route to the hospital.
5. As a paramedic with Wake County, Plaintiff's emergency call volume varied greatly, both from day-to-day and also from station to station. A typical shift with Wake County might involve four or five emergency calls per shift, although on some days he would have more than four or five calls, while on other days he would fewer than four or five calls. During a typical emergency call, plaintiff might perform some bending or some stooping, but the bending or stooping was not continuous in nature. During times when plaintiff was not responding to emergency calls, he could sit in a chair and rest and could even sleep at the EMS station if he wanted to.
6. As a general rule, approximately 35% of emergency EMS calls in Wake County do not involve any transport of the patient to a hospital or a health care facility.
7. During his tenure as a Wake County paramedic, plaintiff was assigned for approximately two years to the EMS station at Raleigh-Durham Airport which is one of the lowest call volume stations in Wake County. Generally, the airport EMS station averaged 30 calls per month, or one call per day.
8. In 1995, plaintiff began working on a part-time basis as a paramedic for Apex EMS. Plaintiff's responsibilities as a paramedic with Apex EMS involved essentially the same duties as a Wake County paramedic, although Apex EMS had a lower call volume than Wake County.
9. Mr. William Voss of Wake County has completed a statistical analysis as to plaintiff's call volume as a paramedic with Wake County. Mr. Voss' analysis reveals that plaintiff was involved 871 emergency calls during the two-year period of 1996 through 1997. This sum of 871 calls includes calls which plaintiff may have attended while working for Apex EMS. This statistical analysis further shows that in a typical year, plaintiff would work approximately 122 shifts of 24-hours duration for Wake County. During an average year, plaintiff would be involved in approximately 435 emergency calls per year. Thus, for the period of 1996 through 1997, plaintiff would be involved in approximately three to four emergency calls per shift. An emergency call involving transport to the hospital generally lasted 60 to 90 minutes per call. However, not all of that time involves actual contact with the patient. In fact, the typical emergency call with hospital transport may involve only 32 minutes of actual contact with the patient.
10. During the same time plaintiff worked for Wake County and for Apex EMS, he also worked for his own construction company, known as Williams Construction, which plaintiff founded in 1994. At Williams Construction, plaintiff's work duties involved the following: light construction, building decks, utility building, fencing, landscaping, shoveling and cleaning driveways and walkways, climbing ladders to clean out gutters, installing and repairing water lines and sewer lines, and operating heavy machinery. Plaintiff's work duties with Williams Construction required him to bend and stoop and to kneel.
11. Plaintiff's busiest years with Williams Construction were 1995 and 1996. In 1996, plaintiff earned approximately $32,000.00 from his work with Williams Construction. For the period of 1995 and 1996, plaintiff worked approximately 55 hours per month with Williams Construction. In 1999, plaintiff worked approximately 694 hours with Williams Construction, for an average of approximately 58 hours per month. Since January of 2002, plaintiff's duties with Williams Construction have involved supervisory duties to a greater extent, but plaintiff was still been involved in operating a nail gun, aerating, mowing lawns, fertilizing lawns and weed eating.
12. As of June of 2003, plaintiff has been working as a medical assistant at a physician's office, where his duties involve meeting with patients and taking their blood pressure and other medical information.
13. Plaintiff's prior medical history is significant for gout, hypertension, and overweight. Plaintiff is 6-feet, one-inch tall and his weight has ranged from approximately 260 to 290 pounds during relevant time periods.
14. As of December 20, 1989, plaintiff already had a history of diffuse pain characterized as gouty arthropathy. By 1990, plaintiff showed early signs of arthritis in his right knee. On August 25, 1994, plaintiff treated with Dr. Peter Gilmer, who surmised that plaintiff may have inflammatory arthritis of the feet and ankles. In 1997, plaintiff treated with Dr. Craig Hoffmeier on multiple occasions for complaints of bilateral knee pain. On December 2, 1997, Dr. Hoffmeier opined that plaintiff had mild arthritis of the knees, along with gout. Throughout the course of this matter, plaintiff has received periodic injections to his knees, even after his retirement from paramedic work.
15. On February 13, 2002, plaintiff was examined by Dr. Hoffmeier for a recent severe headache which left plaintiff feeling confused. Plaintiff was concerned that he may have suffered some type of stroke, and so Dr. Hoffmeier ordered a CT scan of the head. On or around February 20, 2002, Dr. Hoffmeier wrote plaintiff out of work for 30 days in relation to plaintiff's chronic hypertension. Dr. Hoffmeier expressed concern that plaintiff was at risk for stroke and that higher doses of medication lead to unacceptable side effects such as bradychardia or severe fatigue. On April 30, 2002, Dr. Hoffmeier wrote plaintiff out of work due to degenerative joint disease and acceleration of hypertension.
16. Dr. Hoffmeier has indicated that plaintiff's overweight condition was a substantial factor in his development of arthritis in the knees. Dr. Hoffmeier also believes that plaintiff could have worked in a number of other endeavors, other than paramedic work, and still have developed arthritis in his knees.
17. On March 26, 2003, plaintiff underwent an independent medical evaluation with Dr. George C. Venters. Dr. Venters has diagnosed arthritis of the knees. However, Dr. Venters does not believe that plaintiff's knee problems result from causes or conditions that were peculiar to, or characteristic of his job as a paramedic. Moreover, Dr. Venters believes that plaintiff's work duties with Williams Construction could have added to plaintiff's arthritic symptoms.
18. On May 23, 2002, Dr. Peter Gilmer issued a letter in which he opined that plaintiff's employment as an EMT/paramedic had placed him at a greater risk of developing arthritic problems in the knees as compared to the general public. In that same letter, Dr. Gilmer opined that plaintiff's work duties as EMT/paramedic were a significant contributing factor to plaintiff's arthritic knee problems. However, at the time Dr. Gilmer completed that letter, he did not have sufficient information as to the nature of plaintiff's paramedic duties, including whether plaintiff worked as a part-time paramedic or a full-time paramedic, or how many days he worked per week or how many emergency calls he handled per week. In addition, at the time of that letter, Dr. Gilmer had no information as to the extent of plaintiff's work duties with Williams Construction. In fact, upon being presented with information about plaintiff's work responsibilities with Williams Construction, Dr. Gilmer indicated that plaintiff's construction duties "would play just as much a role as what he did as a paramedic" in terms of developing the arthritic knee condition.
19. In addition, Dr. Gilmer is not aware of any epidemiology studies concerning EMT work and joint arthritis; nor is Dr. Gilmer aware of any studies that would indicate that EMT workers are at a greater risk for joint arthritis as opposed to the general public.
20. Mr. Voss of Wake County is not aware of any other compensation claims by Wake County paramedics for repetitive motion injury to the knee. Similarly, Chief Winstead of Apex EMS is not aware of any such claims against his department.
21. Under these circumstances, the undersigned gives little probative weight to the opinions of Dr. Gilmer as to issues of causation and increased risk relating to plaintiff's employment as a paramedic with Wake County. The undersigned gives more probative weight to the opinions of Dr. Hoffmeier and Dr. Venters to the effect that plaintiff suffers from an ordinary disease of life, namely, arthritis, to which plaintiff and the general public are equally exposed.
 * * * * * * * * * * *
Based upon the foregoing findings of fact, the undersigned concludes as follows:
 CONCLUSIONS OF LAW
1. An employee seeking compensation for an occupational disease under N.C. Gen. Stat. § 97-53 (13) must establish that his disease or condition meets the following three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged"; (2) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation"; and (3) there is "a causal connection between the disease and the [claimant's] employment."Rutledge v. Tultex Corp., 308 N.C. 85, 93, 301 S.E. 2d 359, 365
(1983) (citations omitted). The first two elements of this three-pronged test are satisfied where the employee can show that the employment exposed [him] to a greater risk of contracting
the disease than the public generally. Id. at 94,301 S.E. 2d at 365 (emphasis added). An employee does not carry his burden of proof by showing merely that the employment put him at greater risk of "aggravating" or "accelerating" any pre-existing condition. Rather, the employee must show that the employment put him at an increased risk of developing or contracting the particular condition as compared to the general public. See,Futrell v. Resinall Corp., 151 N.C. App. 456, 566 S.E. 2d 181
(2002), affirmed, 357 N.C. 158, 579 S.E. 2d (2003) (affirming denial of claim for carpal tunnel syndrome.) See also, Hobbs v.Clean Control Corp., 154 N.C. App. 433, 571 S.E. 2d 860 (2002) (denying claim for carpal tunnel syndrome).
2. In the instant case, plaintiff suffers from osteoarthritis of the knees, which the undersigned conclude to be no more than "an ordinary disease of life to which the general public is equally exposed outside of the employment [of paramedic]." N.C. Gen. Stat. § 97-53 (13). As such, plaintiff has failed to prove that his employment as a paramedic placed him at greater risk of contracting or developing osteoarthritis of the knees as compared to the general public. Accordingly, his claim for compensation benefits must fail under Rutledge and Futrell, supra., and their progeny.
3. Plaintiff also has the burden of proving "a causal connection between the disease and [his] employment." Rutledge,308 N.C. at 93, 301 S.E. 2d at 365. Plaintiff must prove this element of causation by the greater weight of or a preponderance of the evidence. Phillips v. U.S. Air, Inc., 120 N.C. App. 538,541-542, 463 S.E. 2d 259, 261 (1995), affirmed, 343 N.C. 302,469 S.E. 2d 552 (1996). "[I]n cases involving `complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury.'" Holley v. ACTS, Inc.,357 N.C. 228, 232, 581 S.E. 2d 750, 753 (2003) (quoting Click v.Pilot Freight Carriers, Inc., 300 N.C. 164, 167,265 S.E. 2d 389, 391 (1980)). Moreover, when the expert opinion testimony is based "merely upon speculation and conjecture, . . . it is not sufficiently reliable to qualify as competent evidence on issues of medical causation." Id. (quoting Young v. Hickory BusinessFurniture, 353 N.C. 227, 230, 538 S.E. 2d 912, 915 (2000). Seealso, Faison v. Allen Canning Co., No. COA03-757 (April 20, 2004) (affirming denial of claim for carpal tunnel syndrome on grounds that employee's medical evidence on causation was insufficient.
4. In the instant matter, plaintiff has failed to carry his burden of proving causation with the requisite degree of medical certainty. As such, plaintiff's claim for benefits must fail under the reasoning of Holley, Young, and Faison, supra.
 * * * * * * * * * * *
Based upon the foregoing Findings of Facts and Conclusions of Law, the undersigned enters the following:
 AWARD
1. Plaintiff's subject claim for benefits under the Act must be, and is hereby, DENIED in its entirety.
This the 12th day of October 2006.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER