***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms with modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as: *Page 2 
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and an employment relationship existed between the parties, with Defendant being self-insured.
2. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings.
3. Plaintiff's average weekly wage is $1,077.06.
4. Plaintiff's compensation rate is $718.04.
5. Plaintiff claims an occupational disease with an onset date of disability being June 13, 2009.
6. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Pre-Trial Agreement;
 b. Stipulated Exhibit Two: North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit Three: Plaintiff's medical records.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's bilateral carpal tunnel syndrome is a compensable occupational disease?
2. Whether Plaintiff sustained a compensable injury by accident arising out of and in *Page 3 
the course of her employment with Defendant to her left or right hands?
3. Whether Plaintiff is entitled to any workers' compensation benefits?
4. Whether Dr. Harrison Gray Tuttle should be Plaintiff's authorized treating physician?
5. Whether Plaintiff is at maximum medical improvement?
6. Whether Defendant should respond to Plaintiff's discovery requests?
7. Whether Plaintiff's claim is time-barred by the applicable statute of limitations?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 50 years old, with a date of birth of January 30, 1961. Plaintiff has a high school diploma, and took some business machine operation courses at a community college. Prior to working for Defendant, Plaintiff worked for a company making and processing keys and key cards for hotels.
2. In November 1999, Plaintiff began working for Defendant as a tire loader and approximately six months later, she began working as a tire loader and sorter. As part of Plaintiff's duties as a tire loader and sorter, she handled approximately 1,000 tires per day weighing approximately 30 pounds. Plaintiff continued in the tire loader and sorter position until 2004, when she injured her left wrist loading a tire onto a pallet. Following Plaintiff's left wrist injury in 2004, Defendant re-assigned her to a TUO machine, which was lighter-duty work. While working on the TUO machine, Plaintiff was able to wear a wrist splint and work at her own pace. In May 2005, Plaintiff began working for Defendant as a tire builder on its VMI line, *Page 4 
where she remained until her termination on June 12, 2009.
3. Plaintiff's duties while working for Defendant as a tire loader and sorter from 2000 through 2004 included separate loading and sorting duties. With respect to the loading duties, as tires would come through a conveyor belt, Plaintiff would pull the tires toward her with her left hand, inspect them, put decals and labels on them, pick them up, flip them over, visually check them, and then push a button to send the tires to be balanced. The sorting duties involved pinching tires as they came down a conveyor belt, taking a tire in each hand and walking with them to nearby pallets, sorting them according to the type of tire, and labeling each tire. If two operators were on duty, which was 90 percent of the time, then Plaintiff would alternate with the other employee approximately every two hours from the loading duties to the sorting duties. When Plaintiff had the assistance of another employee in the sorting duties, she alone would handle approximately 1,000 tires per work day, based upon the counter on the conveyor belt.
4. Plaintiff's duties while working for Defendant on the VMI line included continuous use of her hands. Plaintiff would have to press down on the ends of tread to make sure that it was coming together securely onto a tire before it is stitched. Later, Plaintiff would pull up tire material to ensure that it was sticking together and use her hands to press the material so that it would not come apart. Plaintiff also used a hot knife to cut tire material so that it would not overlap, and applied beads to either side of the drum. At the end of the tire-building process, Plaintiff would hit a pedal so that the drum would begin to inflate and build the tire. The most common motions that Plaintiff utilized while working for Defendant on the VMI line included pinching, pulling, and pressing motions with her fingers, and turning her wrists. Plaintiff also lifted and threw tires weighing 15 to 39 pounds onto a conveyor belt every two to three minutes. According to Plaintiff, she used her hands constantly throughout her shift, and built 150 to 180 *Page 5 
tires per day. Mr. Eugene Rose, Plaintiff's immediate supervisor, and Ms. Bernadette Hargrove, who supervised Plaintiff one day, both corroborated, and the Full Commission finds as fact, that Plaintiff's description of her employment duties on the VMI line as a tire builder is credible.
5. In June 2001, approximately 18 months after she began her employment with Defendant, Plaintiff presented to the office of Dr. Daniel Lind Crocker, an internist, hematologist/oncologist, and her primary care physician, with complaints of numbness in her left hand in a radial nerve pattern involving the thumb and second digit for several years that began to worsen over the last month. Dr. Crocker's physician's assistant diagnosed Plaintiff with tendonitis and possible carpal tunnel syndrome. The symptoms eventually resolved on their own. In late July 2004, Plaintiff's left wrist tendonitis flared up again in connection with injuring her left wrist at work, and necessitated her transfer to lighter duty work on the TUO machine.
6. In May 2005, Defendant transferred Plaintiff to the VMI line as a tire builder. Shortly thereafter, Plaintiff began to experience pain in her hands again. Plaintiff reported her hand pain to Defendant's human resources department, and asked to be transferred back to her previous position on the TUO machine. Plaintiff testified that a manager advised her that she would need to stay on the VMI line for another year because she "built more tires than thirty year people. . . ." Sometime in 2006, Plaintiff went back to Defendant's human resources department and again asked to be transferred. Defendant denied Plaintiff's request.
7. On March 24, 2006, almost a year after Plaintiff's transfer to the VMI line, she presented to Dr. Wiley Thurman Cockrell, a family medicine specialist and Defendant's company physician, with complaints of pain and swelling in the dorsal aspect of her right wrist. A physical examination revealed a positive Tinel's sign; however, Dr. Cockrell did not think that *Page 6 
carpal tunnel syndrome was the reason for Plaintiff's complaints, since her symptoms, in his opinion, were on the wrong place on her wrist to be consistent with such a diagnosis. Dr. Cockrell diagnosed Plaintiff with a right forearm/wrist sprain. Plaintiff's pain complaints resolved over the next couple of weeks.
8. On June 8, 2006, Plaintiff returned to Dr. Crocker. Plaintiff complained of left hand swelling and numbness, and also had new complaints of dizziness and headaches. Dr. Crocker referred Plaintiff to Dr. Kevin Straight Good, a neurologist, for the complaints of dizziness and headaches.
9. On June 9, 2006, Plaintiff presented to Dr. Good, who noted that in addition to the dizziness and headaches that were the reason for the referral, she was also experiencing intermittent numbness in the left upper extremity. As a result, Dr. Good ordered nerve testing. On June 13, 2006, Plaintiff underwent the nerve testing and Dr. Good interpreted the results as being positive for bilateral carpal tunnel syndrome. Dr. Good did not discuss with Plaintiff whether her bilateral carpal tunnel syndrome was due to her employment with Defendant, since the primary reason for her referral was to treat her headaches and dizziness. Dr. Good referred Plaintiff to an orthopaedist for her bilateral carpal tunnel syndrome, and released her to return to work pending the referral.
10. Plaintiff continued to seek treatment on an intermittent basis for her upper extremity complaints from both Dr. Crocker and Dr. Kapil Rawal, a neurologist, to whom Dr. Crocker also referred Plaintiff for her complaints of dizziness and headaches. On January 9, 2007, Plaintiff underwent nerve testing. Dr. Rawal interpreted the results of the nerve testing as revealing severe carpal tunnel syndrome on the left and moderate carpal tunnel syndrome on the right. There is no indication in the record that Dr. Rawal discussed with Plaintiff whether her *Page 7 
employment with Defendant was the cause of her bilateral carpal tunnel syndrome.
11. Plaintiff continued to work for Defendant on its VMI line as a tire builder, and continued to experience pain and other problems with her hands such as dropping things, sleeplessness at night due to pain, and difficulty driving. Plaintiff also continued to seek treatment from Dr. Crocker and Dr. Rawal for various complaints. From early 2007 and throughout the entire year of 2008, Dr. Crocker and his physician's assistant saw Plaintiff numerous times; however, there is no mention in their office notes of carpal tunnel syndrome.
12. On February 20, 2009, Plaintiff presented to Dr. Crocker with complaints of wrist pain and numbness "consistent with possible carpal tunnel," and reported using a brace on her left hand. Dr. Crocker ordered nerve testing. On February 23, 2009, Plaintiff saw Dr. Crocker's physician's assistant, who administered steroid injections to her left wrist.
13. On March 5, 2009, Plaintiff underwent additional nerve testing in Dr. Crocker's office performed by Mr. Douglas Marsigli, a physical therapist. Mr. Marsigli noted on the results of the nerve testing a positive Tinel's sign, and that Plaintiff reported "chronic left hand numbness and left UE pain." The results of the nerve testing revealed "findings consistent with severe left median nerve sensory and motor demyelinating focal mononeuropathy at or near the wrist, with evidence of sensory axonal loss." Nothing in the record indicates that anyone in Dr. Crocker's office advised Plaintiff at this time that she had carpal tunnel syndrome as a result of her work with Defendant.
14. On March 31, 2009, Plaintiff presented to Dr. Harrison Gray Tuttle, an orthopaedist, with complaints of pain, tingling, numbness, and initially some swelling in her left hand and fingers for approximately five to six months following a recent incident at work in which she sustained a blow to the palmar aspect of her left wrist. Plaintiff did not voice any *Page 8 
complaints regarding her right upper extremity at this visit. However, Plaintiff did report that her symptoms worsened "with repetitive use of her hands, such as work" and driving, that she had reduced strength in her hands, and that her symptoms affected her ability to sleep. A physical examination revealed positive Tinel's and Phalen's signs, and Dr. Tuttle interpreted Plaintiff's recent nerve testing as revealing "severe left carpal tunnel syndrome." Dr. Tuttle recommended that Plaintiff undergo surgery, "given the persistence of her symptoms, given that she has weak grip strength and given that the EMG nerve conduction study indicates that she has severe carpal tunnel syndrome." Until Plaintiff underwent surgery on both of her hands, Dr. Tuttle was of the opinion that she was not at maximum medical improvement. Dr. Tuttle noted that "it is reasonable to pursue this as a Worker's Compensation claim given the way she [Plaintiff] describes her functions at the job, especially since it sounds as if the symptoms may have begun after a blow to her hand at work."
15. On April 2, 2009, Plaintiff spoke with D. Mackie, R.N. at Dr. Tuttle's office concerning scheduling magnetic resonance imaging (MRI) of her hand. According to Nurse Mackie's note, Plaintiff called to advise that she now wanted to undergo the hand MRI previously suggested by Dr. Tuttle, "as she had an injury at work 6 months" ago. Nurse Mackie noted that Plaintiff stated that "her carpal tunnel syndrome is also a result of work issues," although "[s]he has not filed any claims at work about her injuries."
16. On April 29, 2009, Plaintiff's counsel executed a Form 18 alleging that on June 13, 2006, Plaintiff developed the occupational disease of bilateral carpal tunnel syndrome "and other hand problems" working as a tire builder for Defendant and using her "hands in a manner that would cause CTS." On July 28, 2009, Plaintiff's counsel executed an amended Form 18, accompanied by a Motion to Amend Form 18, alleging that on June 13, 2009, Plaintiff developed *Page 9 
the occupational disease of bilateral carpal tunnel syndrome "and other hand problems" working as a tire builder for Defendant and using her "hands in a manner that would cause CTS." As grounds for amending Plaintiff's Form 18, her Motion stated that although June 13, 2006 was the first date that she received positive test results indicating that she had carpal tunnel syndrome, she missed no work as a result of the diagnosis, and did not have a physician to inform her that her carpal tunnel syndrome was due to her employment with Defendant until she presented to Dr. Tuttle in March 2009.
17. On June 12, 2009, Defendant terminated Plaintiff's employment. Prior to Plaintiff's termination, she applied for family medical leave for medical circumstances for which Defendant previously granted her such leave. However, Defendant denied this most recent family medical leave request and terminated Plaintiff's employment due to absenteeism. Plaintiff applied for and received unemployment compensation, and searched for employment as required by the Employment Security Commission of North Carolina to continue receiving such benefits. As of the date of the hearing before the Deputy Commissioner on February 4, 2010, Plaintiff was still receiving unemployment compensation and searching for suitable employment.
18. On September 15, 2009, Dr. Tuttle sent correspondence to Plaintiff's counsel in which he opined that based upon a review of a written description provided to him of Plaintiff's employment duties with Defendant, "it is more likely than not that her job contributed to her carpal tunnel syndrome" and "did place her at an increased risk to develop carpal tunnel syndrome." Dr. Tuttle was also of the opinion that, based upon Plaintiff's history, physical examination, and nerve testing findings, she has severe carpal tunnel syndrome, and that "it is quite likely that continuing to perform her regular duties would likely be painful for her, and this may potentially lead to worsening of her overall syndrome." In addition, Dr. Tuttle continued to *Page 10 
recommend that Plaintiff undergo surgery, given the severity of her carpal tunnel syndrome, which would require her to perform only "limited duty with her hands at work" for six weeks, after which it would be "somewhat unpredictable about whether or not she would be able to return to her full-duty position."
19. At Dr. Tuttle's deposition, he opined, based upon his review of Plaintiff's medical records, work history, and a video of Plaintiff's employment duties, that she developed carpal tunnel syndrome as a result of her employment with Defendant, and that such employment placed her at an increased risk for the development of carpal tunnel syndrome over that of the general population. Dr. Tuttle felt that Plaintiff's employment with Defendant required her to flex her hands repetitively throughout the performance of her employment duties, that it required a great deal of strength using muscles in her hands, and these factors "caused hypertrophy of the intrinsic muscles," which "can cause compression of the nerve at the wrist." In addition, Dr. Tuttle was of the opinion that Plaintiff's condition got worse while she was working for Defendant, but when she had time away from work her condition got better, which also indicated to him that her employment caused the problems with her hands. The Full Commission gives great weight to the opinion testimony of Dr. Tuttle.
20. Defendant retained Mr. William T. McClure, Jr., a certified ergonomic evaluation specialist, to perform an ergonomic analysis of the tire builder position on Defendant's VMI line. Mr. McClure has a master's degree in exercise physiology, but no formal medical training. Because Plaintiff was not available to demonstrate her employment duties as a tire builder on Defendant's VMI line, Mr. McClure requested that Defendant provide an individual of the same gender with comparable physical build. Defendant made Ms. Tomeka Pender available for Mr. McClure to observe performing the duties of the tire builder position on Defendant's VMI line, *Page 11 
but because Mr. McClure did not know Plaintiff's height or weight, he was unable to definitively determine whether Ms. Pender was of comparable physical build to Plaintiff. At Mr. McClure's deposition, he estimated that Ms. Pender was between five feet, five and seven inches, and weighed between 140 and 145 pounds. Plaintiff's most recent medical records indicate that she is five feet, four inches and weighs approximately 200 pounds.
21. Mr. McClure observed Ms. Pender perform the duties of tire builder on Defendant's VMI line for over three hours and attempted to take measurements of as many objective factors as he could, such as force exerted. However, Mr. McClure did not observe Ms. Pender build each different size and weight of tire that Plaintiff built, did not observe a complete work shift, which is anywhere from eight to 12 hours, and was unable to actually measure Ms. Pender's exertional force other than by observing her muscle/tendon tension due to the soft component of the rubber tires. Moreover, after Plaintiff reviewed the video Mr. McClure took of Ms. Pender performing the duties of tire builder on Defendant's VMI line, she felt that it was not representative of how she performed her duties in terms of the repetitive nature of the work and the amount of force and physical strength exerted by her.
22. Based upon Mr. McClure's observations of Ms. Pender and measurements he took while she performed the duties of tire builder on Defendant's VMI line, he opined that the VMI machine did not create risk factors above an acceptable risk for the development of cumulative trauma disorders of the upper extremity because it appeared that appropriate upper extremity joint postures were being demonstrated, there was a lack of forceful exertions of the fingers and hands in a gripping manner, and a lack of repetitive elements specific to the number of movements performed by upper extremity joints per hour. Mr. McClure conceded, however, that if Plaintiff's description of her employment duties as a tire builder on the VMI line was *Page 12 
accurate, then his opinions may not be accurate. He would need to go back and do a further evaluation. The Full Commission gives little weight to the opinion testimony of Mr. McClure.
23. The Full Commission finds Plaintiff's testimony concerning the nature and description of her employment duties as a tire builder on Defendant's VMI line, as well as her description of the nature and circumstances of her upper extremity complaints to be credible, and gives such testimony great weight.
24. Plaintiff gave Defendant timely notice of her occupational disease claim. No competent medical authority advised Plaintiff that she had occupationally-related carpal tunnel syndrome until March 31, 2009, when Dr. Tuttle both diagnosed bilateral carpal tunnel syndrome and discussed with Plaintiff that her employment was a likely cause of this diagnosis. Plaintiff filed her workers' compensation claim less than 30 days thereafter. Therefore, Plaintiff's workers' compensation claim is not barred.
25. The Full Commission finds, based upon the greater weight of the evidence, that as a result of her employment duties with Defendant Plaintiff has contracted bilateral carpal tunnel syndrome, an occupational disease. Plaintiff's employment duties as a tire builder on Defendant's VMI line placed her at an increased risk for contracting bilateral carpal tunnel syndrome over that of the general population, not so employed, and were significant causative factors in the development of her bilateral carpal tunnel syndrome.
26. The evidence does not support a finding that Plaintiff's hand conditions are the result of an injury by accident arising out of and in the course of her employment with Defendant.
27. Plaintiff is not at maximum medical improvement with respect to her bilateral carpal tunnel syndrome and will need future medical treatment. *Page 13 
28. The medical treatment Plaintiff received from Dr. Crocker, Dr. Good, and Dr. Tuttle with respect to her bilateral carpal tunnel syndrome was reasonably required to effect a cure, to give relief, and/or to lessen her period of disability.
29. The Full Commission finds that Dr. Tuttle should be designated as Plaintiff's authorized treating physician.
30. Based upon the greater weight of the evidence, Plaintiff has proven that she has been temporarily and totally disabled from June 13, 2009 through the present and continuing. Following Defendant's termination of Plaintiff on June 12, 2009, she applied for and received unemployment compensation and has been continuing to search for suitable employment. Although Plaintiff has not been given any specific work restrictions, Dr. Tuttle opined that until Plaintiff has the surgery that he recommended, continuing Plaintiff's employment duties with Defendant would slowly worsen her bilateral carpal tunnel syndrome, and so he would want to "make her job tolerable" by reducing the repetition and strength required to perform her duties. Dr. Tuttle suggested that with patients similar to Plaintiff, he would start out by issuing work restrictions of no lifting, pushing, or pulling over 10 pounds. Based upon this testimony from Dr. Tuttle, the Full Commission finds that Plaintiff has physical limitations that could be a barrier in her efforts to find suitable employment.
31. Plaintiff's average weekly wage is $1,077.06, yielding a compensation rate of $718.04.
30. Given the disposition of this matter, the Full Commission finds that the issue of whether Defendant should respond to Plaintiff's discovery requests is now moot.
 *********** *Page 14 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's workers' compensation claim is not barred by the applicable time limit for filing an occupational disease claim. N.C. Gen. Stat. § 97-58(b) (2010). No physician advised Plaintiff that her employment was the cause of her carpal tunnel syndrome until March 31, 2009, when Dr. Tuttle both diagnosed bilateral carpal tunnel syndrome and discussed with Plaintiff that her employment was a likely cause of this diagnosis. Terrell v.Terminix Services, Incorporated,142 N.C. App. 305, 542 S.E.2d 332 (2001).
2. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./King'sYarn, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
3. Plaintiff established by the greater weight of the evidence that as a result of her employment with Defendant in the tire builder position on the VMI line, she contracted bilateral carpal tunnel syndrome, an occupational disease. N.C. Gen. Stat. § 97-53(13) (2010). The opinion testimony of Dr. Harrison Gray Tuttle, which the Full Commission has given great *Page 15 
weight, is sufficient to meet Plaintiff's burden of proving that her employment duties with Defendant placed her at greater risk for contracting bilateral carpal tunnel syndrome over that of the general public, not so employed, and that Plaintiff's employment duties, more likely than not, caused or significantly contributed to the development of her bilateral carpal tunnel syndrome. N.C. Gen. Stat. § 97-53(13) (2010); Rutledge,308 N.C. 85, 301 S.E.2d 359 (1993).
4. The evidence does not support a finding that Plaintiff's hand conditions are the result of an injury by accident arising out of and in the course of her employment with Defendant. N.C. Gen. Stat. § 97-2(6) (2010); Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
5. Plaintiff is not at maximum medical improvement with respect to her bilateral carpal tunnel syndrome and is in substantial need of future medical treatment. N.C. Gen. Stat. §§ 97-25, 97-25.1 (2010).
6. The medical treatment Plaintiff received with respect to her bilateral carpal tunnel syndrome was reasonably necessary in order to effect a cure, to give relief, and/or to lessen her period of disability, and Defendant is obligated to pay for such treatment. Dr. Tuttle is hereby designated as Plaintiff's authorized treating physician. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1 (2010).
7. Plaintiff has proven that she has been temporarily totally disabled from employment since June 13, 2009. Plaintiff has physical limitations as a result of her bilateral carpal tunnel syndrome and employment duties with Defendant would have worsened her carpal tunnel syndrome had she still been employed. Also, following her termination on June 12, 2009, Plaintiff applied for and received unemployment compensation and searched for suitable employment through the date of the hearing before the Deputy Commissioner. Plaintiff's efforts *Page 16 
to find suitable employment have been reasonable. She has continued to receive unemployment compensation and to satisfy the job search requirements of that program. Therefore, Plaintiff is entitled to temporary total disability compensation in the amount $718.04 per week from June 13, 2009 through the present and continuing. N.C. Gen. Stat. § 97-29 (2010); Hooker v. Stokes ReynoldsHospital/North Carolina Baptist Hosp., Inc.,161 N.C. App. 111, 587 S.E.2d 440 (2003); Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
7. Defendant is entitled to a credit for unemployment compensation benefits Plaintiff has received. N.C. Gen. Stat. § 97-42.1 (2010).
8. Plaintiff's average weekly wage is $1,077.06, yielding a compensation rate of $718.04. N.C. Gen. Stat. § 97-2(5) (2010).
9. The issue of whether Defendant should respond to Plaintiff's discovery requests is now moot.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved and the credit to Defendant for unemployment compensation benefits paid to Plaintiff, Defendant shall pay temporary total disability compensation to Plaintiff at the rate of $718.04 per week from June 13, 2009 through the present and continuing, or until further Order of the North Carolina Industrial Commission. Any accrued compensation shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred in the future as a result of Plaintiff's compensable bilateral carpal tunnel syndrome, for so long as such *Page 17 
evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. Defendant shall receive a credit for the unemployment compensation benefits paid to Plaintiff.
4. A reasonable attorney's fee of 25 percent of the compensation due Plaintiff is approved for Plaintiff's counsel, to be deducted and paid directly to Plaintiff's counsel from the accrued compensation due Plaintiff and thereafter by deducting and paying to Plaintiff's counsel every fourth compensation check.
5. Defendant shall pay the costs of these proceedings.
This the ___ day of February 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER